# United States Court of Appeals
## For the First Circuit

Nos. 02-1364, 02-1415

IN RE: CARL E. BAYLIS,

Debtor.

CONSTANCE B. RUTANEN; ELLA QUEVILLON, by and for the
ESTATE OF ROBERT S. QUEVILLON; THERESA J. ALEXANDER,

Plaintiffs, Appellees/Cross-Appellants,

ROBERT D. QUEVILLON; MARC QUEVILLON; PAULA L. FLOWERS;
JOHN QUEVILLON,

Plaintiffs,

v.

CARL E. BAYLIS, individually and in his capacity as
co-trustee of the ANTONIA QUEVILLON TRUST,

Debtor, Appellant/Cross-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge, and
Howard, Circuit Judge.

David M. Nickless with whom Nickless and Phillips was on
brief for appellant.

Katherine A. Robertson with whom Robert A. Gelinas and Bulkley, Richardson and Gelinas, LLP were on brief for appellees.

December 10, 2002

**LYNCH**, **Circuit Judge**.  This case addresses the rules that should be applied in determining when a fiduciary of a trust is in "defalcation while acting in a fiduciary capacity," and so may not be discharged from those debts in bankruptcy under 11 U.S.C. § 523(a)(4) (2000).  The issue is one of first impression for this court.

I.

We describe the facts as they are set forth in the decision of the Massachusetts Supreme Judicial Court (SJC), as supplemented by the state probate court findings, in the underlying state litigation which gives rise to the judgment debt against Carl Baylis, the bankrupt debtor.

In 1969, Antonia Quevillon, the settlor of the Antonia Quevillon Trust, consulted Baylis, an attorney, regarding the disposition of the apartment buildings she owned and operated.  At that time, she was seventy years old and in poor health. She had no prior relationship with Baylis.  Baylis drafted the trust into which she transferred her property.  The property consisted of eight apartment buildings in Massachusetts: six in Southbridge and two in Worcester.  Baylis also drafted an exculpatory clause into the trust which stated that "[e]ach trustee shall be liable only for his own willful misconduct or omissions in bad faith."

Quevillon died on May 10, 1971.  After her death, the trust was to provide income to her children for a period of twenty

years at which point it would terminate, and the trust property was to be divided equally among the children of Marcel Quevillon, a son of the settlor. (It did so terminate on May 10, 1991.)

Baylis and Estelle Ballard, daughter of the settlor and one of the income beneficiaries, were appointed co-trustees; they served from May 1971 to May 1991. Ballard agreed to manage the property for $50 per week, and was paid from December 1973 through May 1991, for a total of $45,100. Not only did Ballard derive her income from managing the buildings, but she also lived in one unit, and the trust paid her utilities and provided items such as cable television and a washing machine. Baylis did not discuss any management fees with the settlor. By his own admission, he almost entirely abdicated his responsibilities as trustee to Ballard, who alone actively managed the property.

The property appreciated substantially in value from $256,000 in 1971 to $1.3 million in 1986, but paid the income beneficiaries only $48,813 between 1971 and 1985. The trustees had discretion to sell the trust property, and the trust did pay taxes and other expenses from the estate out of income derived from profits and the sale of a building in 1971. The trust sold another building in 1984.

The income beneficiaries were taxed on the capital gains but did not receive any actual distribution of money. Concerned, the income beneficiaries met in 1985 with the co-trustees to

discuss the lack of income from the trust property. The trustees acknowledged that each of the income beneficiaries was owed $82,000. This represented the amount, with interest, of the difference between the actual distributions received and the amount on which each of the beneficiaries had been taxed since May 10, 1971. Baylis told the beneficiaries that the trust was broke. At that meeting, it was decided that the property would be sold and the proceeds invested in government bonds. Ballard did not object to selling the properties.

In late 1985, the trustees began accepting offers on the remaining six buildings. By January 1986, they had received an offer of $215,000 from Mr. and Mrs. Young for two of the Southbridge properties. The Ramshorn Realty Trust, in the business of purchasing and selling apartment buildings since 1986, made another offer, subject to the availability of financing, of $1.425 million for the other four properties. Ramshorn had recently sold substantial assets and had cash on hand to make a down payment. Both purchasers paid deposits of $1,000. The six properties were later appraised for only $1.3 million, significantly below the offers received of $1.64 million.

Ballard, however, desired to own the properties herself. She also intended that the properties not be sold out of the family. Baylis, knowing this, presented the offers to her by letter dated February 5, 1986 and gave her an opportunity to match

them, but it was soon evident that she could not finance the purchase. Baylis tried to cajole her into agreeing to sell to the offerors. She then refused to sell the property and later testified that she had not considered the interests of either the income beneficiaries or the remaindermen in making that decision.

Even though Ballard had refused to sell the property, Baylis forwarded purchase and sale agreements to the prospective buyers on May 20, 1986. The buyers signed the agreements by June 3, 1986 and put down additional deposits. Baylis hoped to close on December 31, 1986, thinking that date would be advantageous for capital gains treatment. Baylis signed the agreement; Ballard refused to sign. Baylis did not go to probate court for instructions.

Baylis instead responded to Ballard on July 22, 1986 by proposing that Ballard would receive the two properties for which $215,000 had been offered, and would allow the other sale, to Ramshorn, to proceed. He did this although the Youngs had signed a Purchase and Sale Agreement that he himself had prepared. Ballard agreed to this proposal, subject to conditions. Baylis did not inform the Youngs of this development. He had appraisals done in anticipation of a license to sell the properties. The Youngs learned of this proposed sale to Ballard and sued the trust, the trustees, and Baylis in his individual capacity. The lawsuit

-6-

sought specific performance of the Purchase and Sale Agreement, and it alleged that Baylis had committed fraud.

The trustees were served with the suit on December 13, 1986; after being served, Ballard then decided that she would not sell at all. As she put it, a sale would have left her "out in the cold with nothing." The trust settled the case with the Youngs and paid the legal expenses associated with the suit. The Youngs' case continued against Baylis individually for fraud. The trust paid $7,000 for defense of the case against Baylis and $15,000 to settle it.

Baylis had prepared and filed a petition in Probate and Family Court for a license to sell the property in December 1986. The SJC later found, however, that Baylis did not disclose to the court Ballard's refusal to consent to the sale:

> Baylis's complaint, however, did not challenge Ballard's refusal at all. Instead the complaint he presented to the court stated that Ballard had submitted her resignation to Baylis and that he had accepted it. The judge, not knowing that Ballard was wrongfully refusing to consent, deferred judgment subject to obtaining Ballard's signature. Baylis never followed up by informing Ballard that she might be in breach of her fiduciary duty by not signing nor did he ask the judge to compel Ballard to agree to the sale. Because Baylis did not file a petition explaining to the judge that the sale would be in the best interests of the beneficiaries and that Ballard was improperly blocking the sale, he did not take the steps reasonably necessary to prevent Ballard from breaching her duty.

Rutanen v. Ballard, 678 N.E.2d 133, 140 (Mass. 1997).

-7-

The income beneficiaries filed suit in probate court against the trustees on May 23, 1988. The trust terminated on May 10, 1991, and the property was transferred to the remaindermen, who intervened in the suit. At that time, the estimated value of the property was $1.081 million. The probate court found that the Youngs and Ramshorn were ready, willing and able to purchase the trust properties, and Ballard and Baylis breached their fiduciary duties by failing to sell the properties in 1986. It also found that Baylis "knowingly allow[ed] Ms. Ballard to breach her fiduciary duties without taking any action."

Baylis claimed that the exculpatory clause he had drafted protected him. The probate court found that these breaches of fiduciary duty were in bad faith and therefore beyond the protection of the clause, and that even if the breaches were not in bad faith, the exculpatory clause was not enforceable because Baylis, a co-trustee, drafted the language, and the settlor was of ill health and had not been advised to seek the advice of outside counsel.

The probate court awarded judgments of $330,079.95 to the beneficiaries and $607,900.27 to the remaindermen on findings that the co-trustees had violated their fiduciary duties.[1] The damages

---

[1] The probate court judgment in favor of the income beneficiaries included damages of $244,493.75 for failure to sell, $27,322.90 for trust expenditures in the defense and settlement of the Young suit and $58,263.30 in pre-judgment interest. The judgment in favor of the remaindermen comprised

included both the net proceeds from the sales and the profits resulting from the planned investment in six-month Treasury bills. Rutanen v. Ballard, No. 88E0072-G1, slip op. at 22-23 (Prob. Ct. Mass. Apr. 15, 1993); Rutanen v. Ballard, No. 88E0072-G1, slip op. at 1-2 (Prob. Ct. Mass. Nov. 4, 1993) (supplemental judgment).

On appeal, the Massachusetts Supreme Judicial Court affirmed the probate court's decision, but solely on the ground that Baylis acted negligently and was not shielded by the exculpatory clause. Rutanen, 678 N.E.2d at 136, 140. As to the probate court's finding of bad faith, the SJC found that "the evidence is more questionable" and declined to rely on it in affirming the decision. Id. at 140.

II.

Faced with the judgments against him, Baylis filed for bankruptcy. The trust's income beneficiaries, as creditors, took the position that their judgment against Baylis was non-dischargeable because the debt resulted from Baylis's "defalcation while acting in a fiduciary capacity" under 11 U.S.C. § 523(a)(4). In addition, they asserted the debts resulted from "willful and malicious injury by the debtor . . . to the property of another." Id. § 523(a)(6). The parties stipulated that the state probate court's findings of fact were binding, except for the finding that Baylis acted in bad faith.

---

$544,767 in damages and $63,133.27 in pre-judgment interest.

-9-

Both sides moved for summary judgment. Although styled as summary judgment, it is evident they expected the court to resolve the case on the stipulated record. The bankruptcy court held that the probate court's finding that Baylis had acted in bad faith had no preclusive effect because it was not essential to the judgment and had not been ruled on by the Supreme Judicial Court. Rutanen v. Baylis, 222 B.R. 1, 7 (Bankr. D. Mass. 1998). It also found Baylis's conduct did not amount to defalcation. Id. at 5. The district court disagreed, holding that Baylis was bound by the probate court's bad faith finding, and as such had committed defalcation. Rutanen v. Baylis, No. 98-30174-NMG, slip op. at 12 (D. Mass. Oct. 29, 1999). This court found that the bad faith finding did not have a preclusive effect because the SJC had refused to affirm on that ground, and remanded the case to the district court. Rutanen v. Baylis (In re Baylis), 217 F.3d 66, 71 (1st Cir. 2000). On remand, on cross-motions for summary judgment, the district court found that Baylis's conduct amounted to defalcation under § 523(a)(4), and that § 523(a)(6) was inapplicable. Rutanen v. Baylis, 275 B.R. 145, 153-54 (D. Mass. 2002). Baylis appeals the § 523(a)(4) determination against him; the plaintiffs cross-appeal the § 523(a)(6) finding.

### III.

Because this case was decided on cross-motions for summary judgment, our review of the bankruptcy court decision is de

-10-

novo. See Piccicuto v. Dwyer, 39 F.3d 37, 40 (1st Cir. 1994). The standard by which to measure "defalcation" of a fiduciary duty for purposes of § 523(a)(4) is a legal question, in any event, to which we give de novo review. The parties have agreed that they are bound by the probate court's findings of fact.

A.        Meaning of Defalcation of a Fiduciary Duty, 11 U.S.C. § 523(a)(4)

Section 523 of the Bankruptcy Code contains a number of exceptions to discharge of debt. Section 523(a) provides that:

> (a)  A discharge . . . does not discharge an individual debtor from any debt . . .
> (4)  for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

(emphasis added). This provision has been part of the Bankruptcy Act since 1867. See An act to establish a uniform system of bankruptcy through the United States, ch. CLXXVI, § 33, 14 Stat. 517, 533 (1867) (repealed 1878); cf. An act to establish a uniform system of bankruptcy throughout the United States, ch. IX, § 1, 5 Stat. 440, 441 (1841) (repealed 1843) (excepting only debts arising from "defalcation as a public officer"). An exception to discharge should be strictly construed. Gleason v. Thaw, 236 U.S. 558, 562 (1915). "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy . . . ." Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994); see Grogan v. Garner, 498 U.S. 279, 286 (1991) (endorsing the "fresh start" policy).

-11-

Within this context, certain rules are clear about the availability of the exception:

1) The burden of proof to establish defalcation is on the creditor, given the "fresh start" policy. In re Menna, 16 F.3d at 9 (a claimant must prove that his "claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)"); see also Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997).[2]

2) The creditor must show defalcation by a preponderance of the evidence. Grogan, 498 U.S. at 286-87.

3) The exception to discharge applies to fiduciaries only while they are acting in a fiduciary capacity.[3]

4) Inherent in "defalcation" is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation.

---

[2] But see In re Niles, 106 F.3d 1456, 1462 (9th Cir. 1997) (shifting the burden to the debtor under the defalcation exception once the creditor demonstrates that the debtor was a fiduciary).

[3] Some years ago, the Supreme Court noted that under § 523(a)(4), the exception for fiduciary capacity applies only to express trusts, and not to equitable trusts created by the debtor's conduct. Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934). Whether this continues to be so is in doubt. See, e.g., Republic of Rwanda v. Uwinama (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001) (ambassadors are fiduciaries for countries they represent). It is undisputed that Baylis is a fiduciary for purposes of § 523(a)(4) and so this case does not present the question of when else a fiduciary capacity arises.

5) In order to avoid redundancy, defalcation must mean something other than fraud and different from "willful and malicious injury," 11 U.S.C. § 523(a)(6).

6) Defalcation is to be measured objectively. <u>Cent. Hanover Bank & Trust Co.</u> v. <u>Herbst</u>, 93 F.2d 510, 512 (2d Cir. 1937).

That then leaves the question of the standard to measure when a fiduciary breach is a "defalcation." The dictionary definitions of defalcation are of limited assistance. <u>Black's Law Dictionary</u> (7th ed. 1999) defines defalcation as, "Loosely, the failure to meet an obligation; a nonfraudulent default." <u>Id.</u> at 427. The <u>Oxford English Dictionary</u> (2d ed. 1989) defines defalcation as, "A monetary deficiency through breach of trust by one who has the management or charge of funds; a fraudulent deficiency in money matters." 4 <u>id.</u> at 369. The <u>Oxford Dictionary of English Etymology</u> (C.T. Onuns ed., 1966) tells us that the word derives from the "earlier defalk which survives in U.S. legal use. See - ation [is] diminution, reduction, curtailment. . . , defective, failure; fraudulent monetary deficiency." <u>Id.</u> at 250. The etymology of the word thus shows the term historically has covered both fraudulent and non-fraudulent acts.[4] Our view is that not every breach of a fiduciary duty amounts to defalcation.

---

[4] By contrast, <u>A Dictionary of Modern American Usage</u> (B. Garner ed., 1998) says that it is only by slipshod extension that "some writers have misused defalcation when referring to a non-fraudulent default," a view contrary to other authors of other dictionaries. <u>Id.</u> at 191.

-13-

The case law in this area is far from a seamless whole.
More than sixty years ago, Judge Learned Hand's carefully equivocal
opinion in Herbst held that there could be defalcation even in the
absence of deliberate wrongdoing.  Recognizing the ambiguities in
the term, he noted:

> All we decide is that when a fiduciary takes money upon
> a conditional authority which may be revoked and knows at
> the time that it may, he is guilty of a "defalcation"
> though it may not be a "fraud," or an "embezzlement," or
> perhaps not even a "misappropriation."

Herbst, 93 F.2d at 512.

Roughly, three interpretive camps have been established
as to the standard for measuring defalcation.  The first is that an
innocent mistake can constitute defalcation.  See Republic of Rwanda
v. Uwinama (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001) (self-
dealing); Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124
F.3d 978, 984 (8th Cir. 1997) (same); Lewis v. Scott (In re Lewis),
97 F.3d 1182, 1186 (9th Cir. 1996) (failure to account fully for
money received).  The second is that negligence by the fiduciary is
required but no more.  See Antlers Roof-Truss & Builders Supply v.
Storie (In re Storie), 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997)
(failure to account).  The third is that at least recklessness by
the fiduciary is required.  See Schwager v. Fallas (In re Schwager),
121 F.3d 177, 185 (5th Cir. 1997) (breach of duty to manage);
Meyer v. Rigdon, 36 F.3d 1375, 1384-85 (7th Cir. 1994) (same);
Carlisle Cashway, Inc. v. Johnson (In re Johnson), 691 F.2d 249, 257

-14-

(6th Cir. 1982) (failure to account); Herbst, 93 F.2d at 512 (for a failure to account, defalcation must be "due to a known breach of the duty, and not to mere negligence or mistake"). The different camps not only exist between the different circuits, but sometimes within the bankruptcy courts of the same circuit, including this one. Compare M-R Sullivan Mfg. Co. v. Sullivan (In re Sullivan), 238 B.R. 230, 237-38 (Bankr. D. Mass. 1999) (recklessness required, considering breach of duty to manage), with Hoff v. Carroll (In re Carroll), 140 B.R. 313, 316 (Bankr. D. Mass. 1992) (negligence or ignorance enough for failure to account). The types of duty which the fiduciary has violated appear to influence the choice of standard regardless of the broad language sometimes used.

The present range of interpretations of "defalcation" among the circuits, from innocent mistake to a civil recklessness standard, does not, in our view, adequately capture Congress's intended meaning of the term in § 523(a)(4). Instead, we find that a defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement. Our view is based on both the structure of 11 U.S.C. § 523(a) and the "fresh start" policy.

A reading of § 523 as a whole indicates that most of the exceptions to discharge in bankruptcy are in place for one of two basic reasons. First, bankruptcy may not be used to avoid the payment of certain types of debts, the repayment of which are

-15-

important for policy reasons. Exceptions to discharge falling in this category include debts for: taxes or customs duties, id. § 523(a)(1), or debts incurred to pay tax, id. § 523(a)(14); alimony and child support payments, id. § 523(a)(5); fines, penalties or forfeitures to the government, id. § 523(a)(7); educational loans made or insured by the government or a nonprofit institution, id. § 523(a)(8); orders of restitution, id. § 523(a)(13); court fees, id. § 523(a)(17); and support owed under state law and enforceable under the Social Security Act, id. § 523(a)(18). The level of fault of the debtor has no bearing on these exceptions; the exception turns on the type of debt.

It is arguable that defalcation by a fiduciary fits into this "type of debt" category -- that is, that Congress intended to reinforce the high standard of care owed by fiduciaries by making debts for defalcation non-dischargeable. That reading is, we think, an unlikely one, and we see no strong federal interest in making every debt from breach of a fiduciary duty non-dischargeable.

The other large category of bankruptcy exceptions relies on fault. These exceptions define not the type of debt itself, but the type of fault that caused the debt. Such exceptions include debts generated by: money, goods or services obtained by fraud or falsehood, id. § 523(a)(2); willful and malicious injury, id. § 523(a)(6); death or injury caused by driving under the influence of alcohol or drugs, id. § 523(a)(9); and the exception we interpret

-16-

here, "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," id. § 523(a)(4).

There is also one exception that spans both categories: the exception "for malicious or reckless failure" to maintain capital of an insured depository institution to the extent required by federal regulatory agencies. Id. § 523(a)(12). This exception combines a level of fault with a type of debt important for reasons of federal financial policy.

As is evident from the above listings, those exceptions that rely exclusively on a level of fault concern extremely serious actions done knowingly or with great risk of harm to others. A charge of driving under the influence of alcohol or drugs requires knowing ingestion of those substances with at least the attributed knowledge of consequent great risk that others will be injured. The exception for willful and malicious injury we discuss below also requires some form of intent. Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998). Obtaining money, goods or services by criminal fraud or false pretenses also requires knowledge and more: a specific intent to defraud. E.g., 18 U.S.C. § 1341 (2000) (mail fraud); United States v. Sawyer, 239 F.3d 31, 40 (1st Cir. 2001). Specific intent requires that the accused have the intent to accomplish the precise criminal act with which he is charged. See Black's Law Dictionary, supra, at 814. The structure of 11 U.S.C. § 523 as a whole, then, suggests that for an act to fall under the

-17-

"defalcation" exception to discharge, it must be a serious one indeed, and some fault must be involved.  The defalcation by a fiduciary, in our view, belongs in this category.

This interpretation is buttressed by the structure of § 523(a)(4) itself.  First, the same line contains exceptions to discharge for fraud and defalcation while acting as a fiduciary, and embezzlement and larceny generally.  Id. § 523(a)(4).  Fraud, embezzlement, and larceny are all serious crimes requiring specific intent.  To the extent that the term covers civil actions for fraud, such as a fraudulent misrepresentation, the maker of the statement must know or believe the statement is untrue or that he has no basis to make the statement.  See Restatement (Second) of Torts § 526 (1976).  Moreover, it is telling that in § 523(a)(4) fraud and defalcation are listed together.

Reading "defalcation" as akin to the other actions constituting fault-based exceptions to discharge is also consistent with the "fresh start" policy undergirding the bankruptcy system. The bankruptcy system is designed and used to obtain a fresh start for those owing debts of many kinds, including civil damages awards. Were this not so, the narrow exceptions in § 523(a) would make little sense.

Of course, the term "defalcation" must mean something different than the other terms listed.  "In construing a statute we are obliged to give effect, if possible, to every word Congress

used." <u>Reiter</u> v. <u>Sonotone Corp.</u>, 442 U.S. 330, 339 (1979). We believe that defalcation lessens the threshold required from one of criminal or civil fraud to something less. To show defalcation, a creditor need not prove that a debtor acted knowingly or willfully, in the sense of specific intent. However, a creditor must be able to show that a debtor's actions were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny.

A debtor fiduciary may not escape the exclusion from discharge of his debt arising out of defalcation by saying he had no specific intent. As in other areas of the law, circumstances will provide the level of wrongdoing needed to constitute a defalcation. One useful analogy is to the law of securities, which requires "scienter." Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst</u> v. <u>Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). A form of recklessness can meet the requirement of scienter, but it is "more like a lesser form of intent." <u>Rizek</u> v. <u>SEC</u>, 215 F.3d 157, 162 (1st Cir. 2000). This form of recklessness is "an extreme departure from the standards of ordinary care." <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 198 (1st Cir. 1999) (quoting <u>Sundstrand Corp.</u> v. <u>Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977)). The mental state required for defalcation is akin to the level of recklessness required for scienter. It is more than

-19-

the mere conscious taking of risk associated with the usual torts standard of recklessness.  See Black's Law Dictionary, supra, at 1276-77.  Instead, defalcation requires something close to a showing of extreme recklessness.

In evaluating whether there is a defalcation of a fiduciary duty, there must be reference to the duty involved.  Of the various duties, the duty of loyalty is "[t]he most fundamental duty owed . . . the duty of a trustee to administer the trust solely in the interest of the beneficiaries."  2A A. Scott, The Law of Trusts § 170 (W.F. Fratcher ed., 4th ed. 2001).

Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest:

> A trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever his personal interest comes or may come into conflict with his duty to the beneficiaries.  As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care, skill, and caution.  But when the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous.  In such a case his interest must yield to that of the beneficiaries.

2A id. § 170.25.  As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty.

B.        Application of Defalcation Standard to Facts

There is no dispute as to the material facts and we are assisted by the probate court findings.[5]

The bankruptcy court granted Baylis's summary judgment motion because it found mere negligence in Baylis's actions:

> The Debtor did not stand by and do nothing.  And he did more than merely ask Ballard to agree to the sales.  He put pressure on her in two ways, first by presenting her with agreements signed by the buyers and later by filing a petition in court to sell the properties.  Although he was adjudicated to have been negligent in not going further and requesting a court order against her, he surely was not in reckless disregard of his obligations concerning Ballard's fiduciary defaults.

Rutanen, 222 B.R. at 5.  Ignoring the probate court's contrary finding, the bankruptcy court found nothing improper in the Trust's payment of the expenses of the suit against Baylis for fraud.

The district court overturned the grant of summary judgment to Baylis and entered summary judgment for the creditors. It found that Baylis, by executing purchase and sale agreements even though Ballard refused to agree to a sale, "practically assured a lawsuit."  Rutanen, 275 B.R. at 152.  Baylis also used trust funds in a resulting lawsuit brought against him personally, not only to pay attorneys' fees, but also to settle the lawsuit.  Id. at 153. Finally, the district court noted that "Baylis is an attorney who

---

[5] As a practical matter these cases will usually come up on appeal with the result determined by the findings of fact made by the bankruptcy court.  Those findings will be binding unless they are clearly erroneous.

specializes in the law of trusts and estates.  He was well aware of the duties required of a fiduciary under trust law."  Id.

Both courts treated the question of the dischargeability of the debt as a unitary one.  We think it more helpful to consider the different components of the judgment debt.  The judgment debt comprises three elements:  $27,322.90 for the trust expenditures for Baylis's benefit on the Youngs' lawsuit against him; over $937,000 for the loss in value of the property due to the failure to sell; and the pre-judgment interest.

We start with the $27,322 payment for Baylis's benefit in the lawsuit against him by the Youngs and the associated interest.  Of course, not all payments from a trust to trustees are inappropriate.  Trustees may receive fees and be reimbursed for expenses.  They may be defended and indemnified in lawsuits.  Nevertheless, the impropriety of those payments here was resolved by the state courts, and that is a binding ruling.  See Rutanen, No. 88E0072-G1, slip op. at 22 (Apr. 15, 1993).  The probate court found that although the trust had no obligation to defend Baylis on the fraud charges brought against him personally or to indemnify him, Baylis caused fees for his defense to be paid by the Trust.  That wrongdoing was compounded by Baylis having the trust pay the $15,000 it took to settle the Youngs' claims of fraud against him personally.  Baylis is bound by the probate court's holding,

-22-

affirmed by the SJC, that these payments were inappropriate. See Montana v. United States, 440 U.S. 147, 153 (1979).

Baylis's actions as to this component of the debt do constitute defalcation. Baylis's actions were in violation of his duty of loyalty. He used trust monies to pay the attorney's fees and settle the lawsuit brought by the Youngs. His breach of the duty of loyalty is exacerbated by the fact that Baylis, in breach of various fiduciary duties, brought about the conditions that led to the lawsuit.

Even after it was apparent to him that Ballard, his co-trustee, had refused to assent to a sale of property to either the Youngs or to Ramshorn, Baylis forwarded purchase and sale agreements to both prospective buyers, who signed them and put down deposits. He thus virtually guaranteed the ensuing litigation with the Youngs, which led to a wasting of the trust's assets in defending and settling the litigation.

Given Baylis's active role in creating the conflict over which the Youngs were suing, he should have requested permission from the probate court before he used trust assets to defend himself against the personal aspects of the Youngs' lawsuit. He did not do so. Instead, he proceeded to use trust assets to defend himself, an extremely reckless thing to do in light of his duty of loyalty.

Given this combination of the fiduciary breach which caused the lawsuit and the self-dealing to defend against it, we

-23-

find that Baylis's actions here constitute defalcation under 11 U.S.C. § 523(a)(4). Thus, the $27,322 of the judgment debt relating to these actions is non-dischargeable.

Whether the remaining damages attributed to the loss in value of the trust from the failure to sell the property resulted from defalcation presents a different question. Baylis, as co-trustee, was obliged to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of the trust. Rutanen, 678 N.E. 2d at 140 (citing Restatement (Second) of Trusts § 184 (1959)). Co-trustees may not acquiesce in the other trustee's refusal to exercise a power the trustees are obligated to exercise. Id. Should that occur, the co-trustee must apply to the courts for instructions.

Baylis argues he acted reasonably in compliance with these obligations when he applied to the probate court in December 1986 to conduct a sale, and so any breach cannot be a defalcation. "Reasonableness," as we have said, is not the test for whether a breach is a defalcation, but if the trustee has acted reasonably, there is no defalcation. For the prior 15 years, Baylis had let Ballard manage the trust properties, largely ignoring his obligations, yet during most of those 15 years it was not evident that Ballard was in breach of her fiduciary obligations. Still, Ballard's breach of her own duty of loyalty around the time of the proposed sales was sufficiently egregious as to amount to a

-24-

defalcation. It is a different matter whether her co-trustee's failure to bring her defalcation to the attention of the probate court was itself a defalcation.

We are troubled by the fact that when Baylis went to the probate court for instructions to sell, he failed to disclose material information to the court. He did not describe the co-trustee's conflict of interest, her breach of fiduciary duty, or the facts giving rise to the problem. Nonetheless, it was not unreasonable for Baylis to think that the matter would be resolved if the court gave instructions to sell the property. His various judgments about how best to handle his troublesome co-trustee were flawed and clearly negligent, but not so reckless as to rise to the level of fault needed to constitute a defalcation.

## C.        Section 523(a)(6)

Finally, the income beneficiaries allege that Baylis's debt is non-dischargeable because it is a "willful and malicious injury by a debtor to another entity or to the property of another entity." § 523(a)(6). As interpreted by Kawaauhau, 523 U.S., "the actor [must] intend the consequences of an act, not simply the act itself." Id. at 61-62 (emphasis in original); see Roumeliotis v. Popa (In re Popa), 140 F.3d 317, 318 (1st Cir. 1998).

Neither the bankruptcy nor the district court found willfulness and intent to injure. Rutanen, 275 B.R. at 154;

Rutanen, 222 B.R. at 8.  Both courts concluded that Baylis's debt would not be non-dischargeable under this provision. We agree.

D.        Conclusion

The judgment of the district court that Baylis's debt is non-dischargeable under 11 U.S.C. § 523 (a)(4) is **affirmed** as to the part of the judgment based on the lawsuit, $27,322.90, and the pre-judgment interest attached, and **reversed** as to the award for loss of property value and consequent pre-judgment interest.  The judgment of the district court that Baylis's debt is not non-dischargeable under 11 U.S.C. § 523(a)(6) is **affirmed**.  The case is **remanded** to the district court for entry of an appropriate judgment. Costs are awarded against Baylis.