05-7026-bk

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

————————————

August Term, 2006

(Argued: September 18, 2006                    Decided: September 6, 2007)

Docket No. 05-7026-bk

————————————

IN RE: ANDREW A. HYMAN,

*Debtor,*

————————————

G. HALLETT DENTON,
As Executor of the Estate of George W. Denton,

*Appellant,*

— v .—

ANDREW A. HYMAN,

*Debtor-Appellee.*

————————————

Before:

CALABRESI and B. D. PARKER, *Circuit Judges,* and LYNCH[*], *District Judge.*

————————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Conner, *J.*) affirming the Bankruptcy Court's (Hardin, *J.*) ruling that collateral estoppel based on findings in prior Surrogate's Court proceedings did not preclude relitigation of a non-dischargeability claim. *See* 11 U.S.C. § 523(a).

---

[*] The Honorable Gerard E. Lynch, United States District Court for the Southern District of New York, sitting by designation.

AFFIRMED.

_____

KENNETH L. STEIN (Norman A. Senior & Jeffery H. Sheetz, *of counsel*), Greenfield Stein & Senior, LLP, New York, NY, *for Appellant G. Hallett Denton.*

ANTHONY L. TERSIGNI, Meyers Tersigni Feldman & Gray, LLP, New York, NY (Richard N. Gray, Meyers Tersigni Feldman & Gray, New York, NY; M. Stuart Goldberg, White Plains, NY, *on the brief*), *for Appellee Andrew A. Hyman.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Appellant G. Hallett Denton ("Denton"), the executor of the estate of George W. Denton, appeals from a judgment of the United States District Court for the Southern District of New York (Conner, *J.*). The district court affirmed an order of the Bankruptcy Court (Hardin, *J.*) that collateral estoppel did not relieve Denton from proving that a debt owed the estate by Appellee Andrew Hyman ("Hyman") was not dischargeable under § 523(a)(4) of the Bankruptcy Code. That section of the Code precludes discharge of a debt resulting from a debtor's "defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). During prior litigation, the Westchester County, New York Surrogate's Court ruled that Hyman, in dealings with the Denton estate, breached his fiduciary duties and misappropriated assets. Both the Bankruptcy Court and the District Court ruled that collateral estoppel did not attach to this finding because the issue of whether Hyman committed a "defalcation" within the meaning of the Bankruptcy Code had not actually been decided by the Surrogate. We agree and we affirm, although on somewhat

2

different grounds.

## I. BACKGROUND

In 1984 Hyman and George W. Denton ("G.W. Denton") began working for an insurance agency in Westchester County, New York owned by Henry Deppe. The agency represented the Guardian Life Insurance Company of America and, among other activities, marketed Guardian life insurance products through pension plans. These plans were designed and administered through a separate company, National Pension Services, Inc., also owned by Deppe, which channeled business to his insurance agency.

In 1987, G.W. Denton and Hyman took over the business from Deppe and formed their own insurance agency, the Denton-Hyman Agency ("Denton-Hyman"), as well as their own pension administration company, also called National Pension Service, Inc. ("NPS"), and a third company, National Pension Actuaries ("NPA"), which generated business for the agency but was not profitable. Each owned fifty percent, and served as director and executive officer, of the three companies. Guardian designated G.W. Denton and Hyman to succeed Deppe as Guardian's agent for Westchester County under an agreement which provided that, if either left the business, their agency relationship with Guardian would terminate. In starting these businesses, G.W. Denton and Hyman incurred substantial debts – exceeding $1.6 million – which they guaranteed jointly and severally. As was the case with Deppe's agency, NPS generated business for Denton-Hyman, but operated at a loss.

In 1989, thirteen months after starting these businesses, G.W. Denton died unexpectedly and Hyman succeeded him as president and sole director of the three corporations. At that point,

3

the agency relationship between Guardian and Denton-Hyman automatically terminated and, in accordance with Guardian's regulations, both the Denton estate and Denton-Hyman were ineligible to become shareholders in the new general agency. Denton-Hyman, however, still owed $1.6 million in start-up debt for which Denton's estate and Hyman were personally liable. To service this obligation Hyman looked, among other sources, to commission income earned by the Denton-Hyman agency during the thirteen-month period prior to G.W. Denton's death but received afterwards. After G.W. Denton's death, Guardian accepted Hyman as its agent and, to service the Guardian business, he formed the Andrew A. Hyman Agency ("Hyman Agency"). Hyman continued to operate NPS, and to fund its deficits so that it would continue to generate business for the Hyman Agency. By 1994, when Hyman's relationship with Guardian terminated, Hyman had liquidated the $1.6 million debt with the estate's consent, using jointly owned assets – the residual commissions earned by Denton-Hyman – and the earnings of the Hyman Agency.

In addition to running the agency and paying down the debt, Hyman also engaged in lengthy negotiations with G. Hallett Denton, the executor of G.W. Denton's estate, for the purchase of the estate's fifty percent interest in Denton-Hyman, NPS and NPA. These negotiations were protracted and difficult, and seem to have foundered over the issue of how much of the income Hyman generated belonged to him and how much needed to be shared with the estate. At the end of the day, no agreement was reached.

At this point, Denton sued Hyman in Surrogate's Court. Denton asserted a derivative claim on behalf of Denton-Hyman, seeking to recover "profits earned by Hyman and the Hyman

4

Agency in exploiting assets of [the jointly-owned] corporations" and "damages suffered as a result of the diversion of corporate assets." Hyman asserted a number of affirmative defenses including ratification and estoppel. After a nine-day trial, the Surrogate's Court entered judgment in favor of the estate and against Hyman and the Hyman Agency for $2,734,832, "representing the net profits obtained by [them] as a result of Hyman's breach of fiduciary duty, as an officer, director and 50% shareholder of Denton-Hyman, NPS, and NPA and their misappropriation of the assets and goodwill of said Corporations." In so ruling, the Surrogate's Court found that Hyman had breached his fiduciary duty by "co-opting the Denton-Hyman, NPS and NPA enterprise for the benefit of the Hyman Agency and for his own personal enrichment," using furniture and fixtures of the corporations without compensation, and using "Denton-Hyman overrides to subsidize NPS and NPA and to satisfy the Hyman Agency debt to the Guardian."

Although the Surrogate's conclusions were undoubtedly damaging to Hyman, they were not accompanied by in-depth analysis of a number of issues relevant to this appeal. The Surrogate, for example, made no findings concerning Hyman's state of mind: In using jointly owned assets and income generated by his own efforts both to liquidate debt of the estate and to operate the business that was generating the income, was Hyman breaching a fiduciary obligation by being sloppy or venal or was he stealing? In addition, the Surrogate's decision gave little prominence to the substantial monetary benefits Hyman conferred on the estate. Nor did it specifically address Hyman's argument that the estate's representatives acquiesced in, and consented to, Hyman's conduct over a lengthy period.

5

In February 2003, Hyman filed for protection under the bankruptcy laws. Denton, as executor of G.W. Denton's estate, then filed a claim based on the Surrogate's Court's judgment, to declare that judgment non-dischargeable under § 523(a)(4) of the Bankruptcy Code as a debt arising from "defalcation while acting in a fiduciary capacity." Denton contended that the Surrogate's findings were conclusive and that Hyman was collaterally estopped from contesting them.

The Bankruptcy Court found the Surrogate's Court's judgment valid and enforceable and allowed Denton's claim based on the judgment. However, the court rejected Denton's contention that collateral estoppel precluded further litigation over the dischargeability of the debt. The Bankruptcy Court ruled that under § 523(a)(4) "defalcation" was narrower than the concept of "misappropriation" under state law, with defalcation requiring "some portion of misconduct." The court then concluded that the Surrogate's Court's findings failed to satisfy the more restrictive definition. In reaching this conclusion, the court emphasized Denton's failure to identify any specific conduct of Hyman's that amounted to a defalcation or that could be characterized as wrongful, illegal or morally reprehensible, "other than the fact that the parties did not reach agreement on a buy out."

Because Denton had voluntarily dismissed alternative claims for relief, and had agreed to abide by the Bankruptcy Court's resolution of the collateral estoppel issue rather than retry the claim, the Bankruptcy Court issued a final judgment in favor of Hyman, and Denton appealed to the district court. The district court affirmed. Judge Conner ruled that defalcation requires some element of wrongful intent, so as to be more than a "mere negligent" or innocent act, and held

that because the Surrogate's Court made no finding as to Hyman's intent, it necessarily failed to decide the issue of defalcation. The district court found that Hyman's immediate offer to buy out the estate's interest, the three-year-long negotiation over the purchase price, and the pay down of the $1.6 million in debt did not demonstrate the level of misconduct necessary to trigger the application of § 523(a)(4). Specifically, Judge Conner concluded that "Debtor's conduct throughout was fully consistent with a good faith effort to preserve the business for the mutual benefit of AHA and the Estate." This appeal followed.

## II. DISCUSSION

### A. Standard of Review

Our review of a district court's order in its capacity as an appellate bankruptcy court is plenary. *In re DeTrano*, 326 F.3d 319, 321 (2d Cir. 2003). The factual determinations and legal conclusions of the Bankruptcy Court are, therefore, reviewed independently by this Court. *Id.* The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual conclusions are reviewed for clear error. *Id.*

### B. New York's Law of Collateral Estoppel

To determine whether collateral estoppel applies to the Surrogate's Court's judgment, we look to New York law. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985)*; Colon v. Coughlin,* 58 F.3d 865, 869 n.2 (2d Cir. 1995). Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action.

7

*Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455-56 (1985); *see Jeffreys v. Griffin*, 1 N.Y.3d 34, 39 (2003); *Buechel v. Bain*, 97 N.Y.2d 295, 303-04 (2001); *see also Khandahar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991). Under New York law, collateral estoppel is a flexible doctrine and whether to apply it a particular case depends on "general notions of fairness involving a practical inquiry into the realities of the litigation." *Jeffreys*, 1 N.Y.3d at 41.

On this appeal, these principles must be analyzed jointly with others that have special significance in the bankruptcy context. The basic policy animating the Bankruptcy Code is to afford the "honest but unfortunate" debtor a fresh start. *Marrama v. Citizens Bank of Mass.*, 127 S. Ct. 1105, 1107 (2007); *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *DeTrano,* 326 F.3d at 322. The consequences to a debtor whose obligations are not discharged are considerable; in many instances, failure to achieve discharge can amount to a financial death sentence. In view of these harsh consequences, exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor. *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000); *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999).

The first critical question is whether a "defalcation while acting in a fiduciary capacity" under § 523(a)(4) of the Bankruptcy Code is identical to the factual and legal determinations necessarily decided in the prior Surrogate's Court action. Denton argues that the issue of whether a defalcation occurred was necessarily decided by the Surrogate's Court's findings that Hyman breached his fiduciary duty and misappropriated assets. Hyman contends that in view of the pervasive confusion in the federal courts over what constitutes "defalcation" under § 523(a)(4), and also in view of the harsh consequences that attach and the requirement that doubts

8

in a close case such as this should be resolved in his favor, he should not be denied the opportunity to prove at a trial in Bankruptcy Court that he did not violate § 523(a)(4).

**C. Whether "Defalcation" Was Necessarily Decided**

While the Code generally allows for the discharge of debts, significant exceptions exist. *DeTrano,* 326 F.3d at 322. Among them is § 523(a)(4) excepting from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). As previously noted, this exception, like most, must be narrowly construed. *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (observing that exceptions to discharge "'should be confined to those plainly expressed'") (quoting *Gleason v. Thaw,* 236 U.S. 558, 562 (1915)); *Renshaw*, 222 F.3d at 86.

There has been much debate among the Circuits over whether a "defalcation" under § 523(a)(4) includes all misappropriations or failures to account or only those that evince some wrongful conduct.[1] *See Zohlman v. Zoldan,* 226 B.R. 767, 775 (S.D.N.Y. 1998) (discussing the circuit split). This Circuit, although previously having suggested that "some portion of misconduct" may be required to establish a "defalcation" under § 523(a)(4), has yet to squarely address this issue. *Cent. Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d Cir. 1937); *see Hayes,* 183 F.3d at 172 (assuming that defalcation demands "some portion of misconduct," in finding that the debtor committed a defalcation).

---

[1] Defalcation is defined in Black's Law Dictionary (8th ed. 2004), as "loosely, the failure to meet an obligation" and "a non-fraudulent debt." *Id.* at 427; *see* Oxford English Dictionary 389 (2d ed. 1989) ("a monetary deficiency through breach of trust by one who has the management or charge of funds").

In *Herbst*, 93 F.2d at 511-12, Judge Learned Hand wrestled with this problem without resolving it. He wrote:

> Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context [the first reference to defalcation in the Bankruptcy Code] it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. It must be remembered that the "fiduciary capacity" was limited to "special" or "technical" fiduciaries.
> ....
> Whatever was the original meaning of "defalcation," it must here [in the Bankruptcy Act of 1867] have covered other defaults than deliberate malversations, else it added nothing to the words, "fraud or embezzlement."[2]
> ....
> We must give the words different meanings so far as we can, especially when a contrary interpretation would wrest "defalcation," if not from its original meaning, at least from that which it must have had in the Act of 1867.
> ....
> We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; in [*In*] *Re Bernard*, 87 F.2d 705, 707 [(2d Cir. 1937)], we said that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake." Although that word probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.

Denton relies on *In re Hammond*, 98 F.2d 703, 704 (2d Cir. 1938), for the proposition that no actual intent is necessary to establish a defalcation. *Hammond* involved our determination of whether the unlawful appropriation of a corporate contract constituted a "misappropriation" under the previous version of § 523(a)(4), absent any finding by the lower court of a "conscious wrongdoing" or "purpose to defraud." *Id.* at 704, 705. *Hammond* does not stand for the proposition that a "misappropriation" under this provision can be found absent a wrongful intent. In *Hammond*, we held that a wrongful or evil intent, if required by the

---

[2]The Act found non-dischargeable debts resulting from "defalcation as a public officer, or while acting in any fiduciary character," fraud or embezzlement. *Herbst*, 93 F.2d at 511.

10

provision, *could* be inferred based on the debtor's intentional unlawful act and by finding the debtor chargeable with the knowledge that his actions violated the law. *Id.* at 705.

The Fourth, Eighth, and Ninth Circuits hold that an innocent mistake can constitute a defalcation. *In re Uwimana,* 274 F.3d 806, 811 (4th Cir. 2001) ("[N]egligence or even an innocent mistake which results in misappropriation or failure to account is sufficient."); *In re Hemmeter,* 242 F.3d 1186, 1190 (9th Cir. 2001) ("Even innocent acts of failure to fully account for money received in trust will be held as non-dischargeable defalcations."); *In re Cochrane,* 124 F.3d 978, 984 (8th Cir. 1997) ("Defalcation includes the innocent default of a fiduciary who fails to account fully for money received.").[3]

The majority of the Circuits addressing this issue, however, require some level of wrongful conduct in order to find a defalcation under § 523(a)(4). The Fifth, Sixth, and Seventh Circuits require a level of fault greater than mere negligence. *In re Schwager*, 121 F.3d 177, 185 (5th Cir. 1997) ("While defalcation may not require actual intent, it does require some level of mental culpability. It is clear in the Fifth Circuit that a 'willful neglect' of fiduciary duty constitutes a defalcation – essentially a recklessness standard."); *Meyer v. Rigdon,* 36 F.3d 1375, 1384-85 (7th Cir. 1994) ("[A] mere negligent breach of a fiduciary duty is *not* a 'defalcation' under section 523(a)(11)."); *In re Johnson,* 691 F.2d 249, 257 (6th Cir. 1982) (ruling that while "subjective intent to violate a known fiduciary duty or bad faith is irrelevant," the misuse of monies as the result of negligence or a mistake of fact does not constitute defalcation). The

---

[3]The Ninth Circuit does, however, more strictly limit the application of defalcation to fiduciary of trusts and relationships that exhibit characteristics of the traditional trust relationship. *Hemmeter,* 242 F.3d at 1189-90.

11

Tenth Circuit's standard is not entirely clear but at least requires "some portion of misconduct." *Compare In re Storie*, 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997) (announcing a standard requiring that includes "intentional, wilful, reckless or negligent" breaches of fiduciary duty), *with In re Millikan,* 188 Fed. App'x 699, 702 (10th Cir. 2006) (unpublished) (declining to identify a specific standard but requiring "some portion of misconduct" to prove defalcation). The First Circuit set the highest bar, requiring a showing of extreme recklessness, "akin to the level of recklessness required for scienter [in securities law]." *In re Baylis,* 313 F.3d 9, 20 (1st Cir. 2002). In so ruling, the First Circuit interpreted "defalcation" as requiring a degree of fault, "closer to fraud, without the necessity of meeting a strict specific intent requirement."[4] *Id.* at 18-19.

In light of this persistent confusion, we now align ourselves with the First Circuit, *see Baylis*, 313 F.3d at 20, in holding that defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). We believe that these concepts – well understood and commonly applied in the securities law context – strike the proper balance under § 523(a)(4). This standard ensures that the term "defalcation" complements but does not dilute the other terms

[4]The Eleventh Circuit also has yet to adopt a clear standard. *See In re Fernandez-Rocha,* 451 F.3d 813, 817 (11th Cir. 2006) (discussing the different possible interpretations of defalcation); *Quaif v. Johnson,* 4 F.3d 950, 955 (11th Cir. 1993) (finding a defalcation where the improper transfer of funds by a fiduciary "was far more than an innocent mistake or even negligence").

of the provision – "fraud," "embezzlement," and "larceny" – all of which require a showing of actual wrongful intent. *See In re Stern*, 231 B.R. 25, 26 (S.D.N.Y. 1999) (noting that larceny under § 523(a)(4) requires a showing of fraudulent intent to convert another's property to debtor's own use); *In re Caulfield*, 192 B.R. 808, 818 (Bankr. E.D.N.Y. 1996) (requiring a showing of fraudulent intent for larceny and embezzlement); *see also In re Zois*, 269 B.R. 89, 101 (Bankr. S.D.N.Y. 1999) (requiring a showing of intentional deceit to establish "fraud" under this section); 4 Collier on Bankruptcy § 523.10(1)(a) (15th ed. rev. 2007) ("'Fraud' for purposes of this exception has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud.").

By requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit "some portion of misconduct." *Herbst*, 93 F.2d at 512. The standard does not reach fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable. This standard, we believe, also has the virtue of ease of application since the courts and litigants have reference to a robust body of securities law examining what these terms mean.

In finding that Hyman breached his fiduciary duty by "misappropriating and co-opting assets of the jointly-owned companies for his personal benefit," the Surrogate's Court made no express findings with regard to Hyman's state of mind. We assume that the Surrogate concluded that under New York law such findings were not necessary, since misappropriation and breach of

13

fiduciary duties apparently do not, under New York law, consistently require proof of a culpable mental state. *See Strough v. Bd. of Supervisors,* 3 N.Y.S. 110, 112 (N.Y. Gen. Term 1888), *modified on other grounds and aff'd,* 119 N.Y. 212 (1890) (holding defendant liable for "illegal, though innocent in intent, misappropriation"); *Matter of Happy Time Fashions,* 7 B.R. 665, 670 (Bankr. S.D.N.Y. 1980) (noting that good faith or innocent motives are no defense to a corporate officer's breach of fiduciary duties).[5]

Having clarified the standard under § 523(a)(4) and given the unique circumstances of this case, we decline to mechanically apply collateral estoppel. *See Jeffreys*, 1 N.Y. 3d at 41; *People v. Roselle*, 84 N.Y.2d 350, 357 (1994) ("[C]ollateral estoppel, a flexible doctrine, should not be mechanically applied just because some of its formal prerequisites, like identity of the parties, identity of issues, a final and valid prior judgment and a full and fair opportunity to litigate the prior determination, may be present."); *Halyalkar v. Bd. of Regents*, 72 N.Y.2d 261, 269 (1988) (declining to give an administrative consent order preclusive effect and noting that the doctrine of collateral estoppel "should never be rigidly or mechanically applied"). The Surrogate had neither the ability nor the incentive to apply the standard we announce. Moreover,

---

[5]The New York Jurisprudence states:

> Corporate directors and officers will be held accountable for the wrongful use, diversion, or misappropriation of corporate funds or property in an action appropriate for the enforcement of such liability. Good intentions do not justify the misapplication or misuse of corporate assets where the directors know that the use they are making of the assets is not for the benefit of the company, but for the use and benefit of other enterprises in which they are interested.

N.Y. Jur. 2d, 14A Business Relationships § 695 (2006).

14

the record contains evidence of Hyman's good faith in using the proceeds of the new Agency to pay off the debts for which both he and the Denton estate were liable, and in attempting for years to negotiate a buy-out with the Denton estate[6] – all of which could militate against the required showing of recklessness or conscious misbehavior. As noted above, the Surrogate's Court was not required to take such considerations into account when reaching its conclusions concerning misappropriation and breach of fiduciary duty. In view of these complexities, we are loath to conclude that an identical issue was necessarily decided or that Hyman had a full and fair opportunity to contest his state of mind. In addition to the murkiness of the law, the harsh consequences that follow a finding of nondischargeability and the requirement that exceptions be narrowly construed both counsel against precluding a plenary trial in Bankruptcy Court, had the estate not voluntarily agreed to forego one here. Accordingly, we conclude that collateral estoppel does not attach.

## III. CONCLUSION

The district court's judgment is AFFIRMED.

---

[6]Denton argues that the Surrogate's Court effectively did find an absence of good faith in rejecting Hyman's affirmative defenses of ratification and consent. Even if the Surrogate did clearly reject Hyman's argument that Denton consented to these acts – which is entirely unclear – a lack of good faith was not necessarily decided by the Surrogate's rejection of Hyman's affirmative defenses. Even absent Denton's consent or ratification of Hyman's acts, good faith could still be found based on evidence in the record. As indicated by the Bankruptcy Court and the district court, there is other evidence, namely the extensive buy-out negotiations and the payment of Denton-Hyman debt that stands as evidence of good faith on Hyman's part; therefore a lack of ratification and consent would not necessarily decide the existence of good faith.