CHARLES L. CRAGIN *vs.* WILLIAM R. JONES & another.

Suffolk. April 11, 1932. — June 29, 1933.

Present: RUGG, C.J., WAIT, FIELD, & DONAHUE, JJ.

*Stockbroker. Contract,* Performance and breach. *Proximate Cause. Equity Jurisdiction,* Accounting. *Damages,* Nominal.

A suit in equity, brought against a stockbroker by a customer for an accounting as to a margin account could not be maintained on the ground that, in violation of his contractual relations with the plaintiff, the defendant did not retain in his possession securities left with him by the plaintiff as security for the account or purchased by the defendant for the plaintiff with the understanding that, should the plaintiff close the account when a balance was due him and demand the securities when they still were in the defendant's possession, he would be entitled to them, where, from findings by a master, it appeared that the plaintiff never made such a demand and that a loss suffered by him was not by reason of the defendant's not retaining such securities.

Although the plaintiff might have been entitled to nominal damages for the breach of contract above described, it was proper to dismiss the bill without reference to nominal damages since no ground for equitable relief was shown.

BILL IN EQUITY, filed in the Superior Court on August 19, 1922, and described in the opinion.

The suit was referred to a master. Material facts found by him are stated in the opinion. After a hearing by *Donnelly,* J., a final decree dismissing the bill was entered. The plaintiff appealed.

*J. Cavanagh,* for the plaintiff.

*C. H. Waterman,* (*T. S. Bubier* with him,) for the defendants.

DONAHUE, J. The defendants were stockbrokers with whom the plaintiff between August 9, 1920, and March 5, 1922, traded in stocks on a margin account. The margin consisted of Liberty bonds aggregating in par value $8,000 which were deposited with the defendants by the plaintiff from time to time between August 10, 1920, and February 18, 1921, and of stocks purchased by the defendants on the plaintiff's order so long as they remained unsold. After October 24, 1921, which was the date of the plaintiff's last order of sale, his account was gradually liquidated. This process was completed on March 5, 1922, with the result that there was then a balance of $11.25 on the defendants' books in favor of the plaintiff. The defendants' check for that amount was sent to the plaintiff but it has never been cashed. The case was referred to a master and from a final decree dismissing the plaintiff's bill in equity with costs the plaintiff has appealed. The bill prays for an account of all moneys and securities paid and delivered by the plaintiff to the defendants, for an order that the defendants pay and deliver to the plaintiff all sums and securities found to be due and owned by the plaintiff, for an order that the defendants deliver to the plaintiff specific Liberty bonds deposited by him as margin security and for such further relief as the nature of the case may require.

The plaintiff's bill does not assert rights under the gaming statute (now G. L. [Ter. Ed.] c. 137, §§ 4–7). The bill is lengthy but the greater part of what is there alleged may be stated in condensed form as follows: It recites (a) that the plaintiff purchased securities relying on various misrepresentations by the defendants of material facts concerning the value of the securities, and the condition of the companies issuing the securities; (b) that the defendants manipulated the market price of the securities by making fictitious purchases and sales and controlled the market so that fictitious and low market quotations were made on the basis of which they called upon their customers for

additional margins or wiped out their accounts; (c) that by such manipulations and control the plaintiff's securities depreciated in price and the plaintiff lost all of the Liberty bonds which he had deposited with the defendants; and (d) that in certain instances orders for the purchase or sale of securities given by the plaintiff were not carried out by the defendants although the defendants reported to the plaintiff that they had been made. The master's report affords no foundation of fact for any of these contentions. As to these allegations the master found in substance that no actionable misrepresentations were made; that the plaintiff had not sustained the burden of proving that the defendants manipulated and controlled the market; and that the defendants actually carried out all of the purchases and all of the sales which the plaintiff ordered them to make. The evidence before the master was not fully reported. As there is nothing in the fragments of that evidence appearing in the record or in the subsidiary findings of the master indicative of error in the foregoing conclusions they cannot now be upset. *Nelson* v. *Belmont*, 274 Mass. 35, 39.

The contention mainly argued before us on behalf of the plaintiff, in effect, that he is entitled to equitable relief for the failure of the defendants to perform their contract in respect to the carrying of the securities purchased on his account and the securities deposited by him as margin, is not represented by very definite allegations in his bill but we treat it as open under the assertion there made "That in some cases on orders from the plaintiff and other customers to purchase securities an actual purchase and sale would be made, but would shortly be paid out by the defendants without any order or direction from the plaintiff or other customers."

As to the contract between the parties the master found that "The plaintiff in making these purchases did not intend to pay for these stocks in full and take delivery of the certificates. Nor did the defendants expect that the plaintiff would pay in full for these stocks. The understanding was that [the] plaintiff was to become a margin customer.

. . . in all of the trading that [the] plaintiff carried on through the defendants, the plaintiff was always a margin customer. . . . The plaintiff's status . . . differed from that of the usual margin customer in one respect. The usual margin customer pays some money to the broker, this money constituting the margin which protects the broker from loss in case the stocks bought and carried for the customer depreciate in market value. The plaintiff paid no money to the defendants, at any time. Instead he deposited with the defendants certain Liberty bonds, which bonds were kept by the defendants as collateral margin on the plaintiff's account. The plaintiff thus always owed the defendants the total cost of securities purchased and carried by him with commissions added and interest computed monthly on his debit balances. The plaintiff's debit balances were diminished by credits of dividends paid on stocks carried . . . and by credits for the net sale prices of securities sold. The debit balance owed by [the] plaintiff to [the] defendants was secured by the stocks bought and carried by the defendants for the plaintiff, and by the Liberty bonds deposited with the defendants by the plaintiff. The market value of the stocks and bonds taken together was supposed at all times to be a certain percentage greater than the plaintiff's debit balance. The percentage was about twenty per cent. That is to say, the plaintiff's debit balance was supposed to have been no greater than eighty per cent of the total value of the securities."

The plaintiff bases his contention that the defendants committed a breach of their contract as to carrying his stocks on the following findings of the master: The defendants had formed and controlled certain corporations referred to in the record as finance companies. With these companies the defendants hypothecated for loans some of the stocks carried for their margin customers. Upon receiving some of such stocks the finance companies promptly repledged them with one Stone, a person of no financial responsibility who had once been employed directly by the defendants. Stone at once sold the stocks through the

defendants to get the money which the finance companies loaned to the defendants. The master found that "The scheme . . . was one devised by the defendants for the purpose of selling out some of the stocks carried for their margin customers. The defendants were not only cognizant of all the details of the transactions, but they had in fact planned them. The scheme was simply a device to permit the defendants to sell out the stocks of some of their customers, instead of carrying them as they should have done, without making it perfectly obvious from an inspection of their books that they had sold out their customers." The defendants did not sell in this manner all of the stocks they were supposed to be carrying for their margin customers, but the master was unable on the evidence to determine what proportion of such stocks was thus sold. He found that "They always kept enough stock in their possession or control to meet the demands of any number of their margin customers who would be likely at any time to close out their accounts, either by paying off their debit balances and taking delivery of their stocks, or by selling out their stocks and taking checks for the balance of the account due them" and that "while the plaintiff was trading with the defendants, the defendants did not at any time have in their possession or control . . . enough stocks to satisfy the demands of their margin customers, if all of the margin customers had paid off their debit balances at one time and had demanded delivery of their stocks." The master found that it was the custom of brokers (which was followed by the defendants) not to allocate to the margin account of any particular customer securities purchased for him, that securities so purchased are transferred to the name of the broker or kept by the broker in the form of indorsed certificates which may be transferred to his name at any time, and that if there was a purchase of a particular stock on the plaintiff's account and later a sale of it the certificate received on the purchase of the stock would not necessarily be the same certificate that was delivered on its sale. He found that there was no evidence as to whether or not certificates of stock purchased by the

defendants for the plaintiff's account were sold out by the defendants through the medium of their finance companies or were actually kept in their possession or control, and further found that these facts could not be established without the production of certain records of the defendants. The only evidence as to these records was that they had been destroyed by the receiver who was appointed upon the filing of a petition in bankruptcy against the defendants.

Assuming without deciding that the failure of the defendants at all times to have in their possession or control sufficient securities of the kind purchased or held on the plaintiff's account to satisfy the demands if made at one time by all of their margin customers with whom they had contracted to carry such securities, was a breach of the contract they made with the plaintiff, on the facts found by the master there is no equitable relief which can be granted to the plaintiff, and no basis on which actual damages could be assessed. The theory of damage for a breach of contract calls for the determination of the amount of money necessary to put a plaintiff in the same position he would be in if the contract had been fulfilled. *Hall* v. *Paine*, 224 Mass. 62, 65. *Snelling* v. *Dine*, 270 Mass. 501, 506. If the position of such a party has not been altered he has suffered no actual damage. This plaintiff's position would be the same if the defendants had at all times actually kept possession of securities, of the kind carried for the plaintiff, adequate to meet all demands. The plaintiff never made demand for any of his securities or sought to close his account. The defendants actually executed every order for purchase and for sale given by the plaintiff. They carried out properly all the sales which they made in liquidating the plaintiff's account. The plaintiff failed to prove that the defendants controlled or manipulated the market price to his injury. On the findings of the master there was no causal relation between the manner in which the defendants dealt with some of the securities of their margin customers, and the loss which came to the plaintiff. For any breach of their contractual obligations even though no actual loss resulted the defendants would be liable in

nominal damages.  *Stewart* v. *Johnson,* 252 Mass. 287, 289.
*McNulty* v. *Whitney,* 273 Mass. 494, 504.  However, since
the plaintiff here is not entitled to equitable relief, there
was no error in entering a final decree dismissing the bill
without reference to nominal damages.  *Smith* v. *New
England Aircraft Co. Inc.* 270 Mass. 511, 532.

The defendant appealed from interlocutory decrees over-
ruling a demurrer and overruling the defendant's objections
to the master's report. . It is unnecessary to consider ques-
tions raised by those appeals since in any event a decree
must be entered dismissing the bill.

<i>Decree affirmed.</i>