In re Michael P. FRIEDMAN, Debtor.

Lorraine Baker, Plaintiff,

v.

Michael P. Friedman, Defendant.

Bankruptcy No. 02–13038–JNF.
Adversary No. 02–1323.

United States Bankruptcy Court,
D. Massachusetts.

Sept. 11, 2003.

William G. Billingham, Billingham & Marzelli, Marshfield, MA, for Plaintiff.

Timothy M. Mauser, Mauser & Mauser, Boston, MA, for Defendant/Debtor.

## MEMORANDUM

JOAN N. FEENEY, Chief Judge.

## I. INTRODUCTION

The matter before the Court is the adversary proceeding brought by the Plaintiff, Lorraine Baker ("Baker"), against the Debtor/Defendant, Michael P. Friedman ("Friedman" or the "Debtor"), a licensed attorney in Massachusetts, through which Baker seeks a determination that a debt owed to her by Friedman with respect to a partnership in which they were both partners is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).[1] The Court conducted a trial on June 23, 2003 at which Friedman and Baker testified and 23 exhibits were introduced in evidence. The issues presented include whether Friedman owed Baker a fiduciary duty within the meaning of § 523(a)(4) and whether his conduct constituted a "defalcation while acting in a fiduciary capacity" as that phrase has been interpreted by the United States Court of Appeals for the First Circuit in *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir.2002).

## II. FACTS

Baker, a Brockton resident for over 43 years, met Friedman and Paul Mauro ("Mauro"), an insurance salesman and financial planner, through her late husband Eliot Baker, who passed away in mid-

December of 1988 at the age of 57. Mr. Baker used the services of both Friedman and Mauro in conjunction with his airfreight business, and Friedman advised Mr. Baker on legal matters relating to his business for many years. Friedman prepared wills for both Baker and her husband. Indeed, in Baker's last will and testament, Friedman is named as her executor because her husband, who was to be her executor, predeceased her. (Exhibit 1). Baker considered Friedman the family's attorney.

As part of his business affairs, Eliot Baker's life was insured. When he died, Baker testified that Friedman arranged for the filing of her husband's estate tax return, as well as the probate of his estate, engaging members of Brickley, Sears & Sorrett, a professional association in which he practiced law at all times pertinent to Baker's Complaint.

Mauro sold Baker life insurance and, according to Friedman, Mauro and Baker decided that the best way for the life insurance policies to be held would be in an irrevocable life insurance trust. Friedman drafted the trust instrument, and he and Mauro served, and continue to serve, as trustees of the Lorraine Baker Irrevocable Trust of 1992. Baker's children are the beneficiaries of the trust.

In or around 1990, Mauro approached Friedman about the acquisition of several life insurance policies which would provide substantial cash payments upon the death of the insured. Mauro's client, Carl J.

---

1. Baker filed a nine Count complaint against Friedman. In the first six counts of the Complaint, she alleged that in his capacity as her partner, attorney, or trustee of an investment trust he made false representations as to the nature of her investment. In Count VII, she alleged he violated the Rules of Professional Conduct, specifically Supreme Judicial Court Rule 3.07. In Count VIII, she complained about his failure to advise her that he had not made his promised contributions to the partnership and violated the rules of professional conduct, causing her damages. Finally, in Count IX, she seeks an adjudication as to the amount of the debt owed to her by Friedman.

DeCotis ("DeCotis"), wished to sell three such life insurance policies. According to Friedman, "Mauro felt that Mr. De Kotis [sic] was in ill health, he suffered from diabetes, that the policies were paying a good interest rate and that it would be a very good opportunity to acquire these policies...." Tr. at 78. Indeed, Mauro convinced Friedman that three policies on DeCotis's life, which provided a death benefit of $3.3 million, presented a lucrative investment opportunity.

Mauro and Friedman had a rough idea that the surrender values of the policies were approximately $70,000. They also knew that DeCotis would not sell them for that sum because he "had originally put in about $50,000 into each of the policies." Tr. at 79. Because neither Mauro nor Friedman had the money to buy the polices, they agreed they needed a third person and about $125,000 in cash to acquire them. They targeted Lorraine Baker as the person who would provide the cash.

Friedman called Baker at her home to arrange a meeting, telling her he had an important matter to discuss with her and Mauro. According to Baker, Friedman refused to discuss the details of the matter with her on the telephone. Because she trusted Friedman and Mauro, she agreed to meet with them.

Friedman arrived at Baker's home before Mauro and apprised Baker of the opportunity to purchase the life insurance policies. Baker testified as follows:

> [T]he first thing I said, "That's got to be against the law to insure another person for your own benefit?" I said, "That's—illegal." He said, "No, no, it's not illegal."
>
> * * * * * *
>
> [I]t was all that in that meeting there that he—he—told me this—about this man, whose name they won't allow me to

know, who wanted to get some money back on his insurance policies because he had too many and he was divorcing his wife, so he—he—she had enough, he felt, and he wanted to get rid of these other ones.

> * * * * * *
>
> [T]o begin with I was very much against it. I thought it was a wrong thing to do.... I didn't understand it, and—and I was waiting for Paul Mauro to come, which he—he didn't show up until it was—until it was—the end, and ... he told me a long story, which I can't remember now, that—"We have to do this and we have to do it right away, and can't let a day go by" and, otherwise, you know, the opportunity would be gone, and ... I was really very nervous and ... I really didn't want to do it. I didn't think it was right and ... but nevertheless, before that afternoon was over, he talked me into it and I—I signed it against my will, and then after I signed it, he handed me a letter which obviously he had pre-written, pre-typed, saying that, "For this transaction, I can no longer be your—I cannot be your lawyer for this transaction."

Tr. at 117–18.

On December 3, 1990, Baker acknowledged receipt, as well as an understanding of the contents, of a letter to her from Friedman dated November 30, 1990. In his letter, Friedman stated the following:

> I am writing to outline to you certain issues with respect to the investment you discussed with Mr. Paul Mauro and I regarding the purchase of existing life insurance policies insuring the life of another individual.
>
> In addition to once again explaining to you the general nature of the investment, I am writing to explain to you that for this transaction only, I am not and

cannot act as your lawyer. To do so would be a conflict of interest because I will be sharing in this investment with you. Lawyers are not permitted to advise their clients with respect to matters in which they have a personal interest. In this matter, you, Mr. Mauro, and I will essentially be participating in a business transaction together, and therefore I will be acting for my own interest and, insofar as they are the same, for our mutual interests. For this reason, I strongly recommend that you consult outside legal advisors with respect to this situation.

\* \* \* \* \* \*

As regards the transaction itself, the objective is to purchase three existing life insurance policies which insure the life of a third party and provide a death benefit in the gross amount of 3.3 Million Dollars. It is our intention that Paul Mauro and I will be responsible for locating and securing these policies, and, beginning in the first year following the year of acquisition, we will contribute sufficient cash yearly to sustain the policies by paying the "mortality" costs or premiums due after the policies have been credited with a premium payment for interest from the "cash value" of the policies. You will make a one time payment of One Hundred Twenty-five Thousand ($125,000.00) Dollars towards these expenses and be responsible for no further costs of the transactions.

Upon the death of the insured, we will divide the death benefit proceeds received equally between the three of us.

I will likely be creating a structure for holding these policies (either a partnership, trust or corporation) which will reflect our respective interests and obligations as well as allowing our respective heirs to receive our interests if one of us should predecease the insured.

Please review this letter carefully. It is important to each and all of us that we begin this undertaking with an understanding of our respective rights, obligations and loyalties as relate [sic] to this transaction. I once again strongly recommend that you obtain outside legal advice before entering this transaction. (Exhibit 8).

Although Baker did not testify that the November 30, 1990 letter was the one Friedman presented her during the meeting at her Brockton home, she signed the bottom of the letter on December 3, 1990, acknowledging its receipt and her understanding of its contents. The Court concludes from the chronology of events and from Baker's testimony that the letter she testified that she signed at the Brockton meeting was the November 30, 1990 letter, that the Brockton meeting occurred on December 3, 1990, and that Friedman had her sign the letter at the meeting in her Brockton home. The Court takes judicial notice that in 1990 November 30th was a Friday and December 3rd was a Monday. Accordingly, if Friedman mailed Baker the letter, she had virtually no opportunity to consult an attorney despite Friedman's advice to her to do so; if he presented the letter to her at the Brockton meeting, as it appears that he did, she had no opportunity whatsoever to consult an attorney.

Baker gave Friedman a check for $125,000 sometime between December of 1990 and January of 1991. Friedman placed the proceeds of the check, not in a separate partnership account, but in his clients' funds account. Friedman then employed Wayne R. Pastel, Esq. ("Pastel") to draft a partnership agreement and an investment trust. On January 28, 1991, Pastel forwarded Friedman copies of the "Partnership Agreement of LGR Partnership" and "The LGR Investment Trust," in which Pastel was named trustee. (Exhibit

11). Three days later, on January 31, 1991, Friedman contacted Christopher G. Fallon, Esq. ("Fallon"), DeCotis's attorney, enclosing documents for his review and for execution by his client, including a Memorandum of Agreement, three assignments of life insurance policies and two requests for policy service to Life of Virginia. In his letter, Friedman advised Fallon that he was holding the $110,000 purchase price in good funds in his clients' funds account and would make the transfer as soon as DeCotis completed the transaction. (Exhibit 20).

On February 4, 1991, Friedman, Mauro and Baker executed the Partnership Agreement for the LGR Partnership, (Exhibit 6), and a schedule attached to the LGR Trust. The Partnership was identified as the beneficiary of The LGR Investment Trust. (Exhibit 7). Friedman, Mauro and Baker, in their capacity as partners of the holder of the beneficial interest, i.e., the partnership, agreed in the Schedule of Beneficial Interests attached to the trust instrument that "the consent and approval of the holders of a majority of the present Beneficial Interests of the trust shall be necessary to constitute the consent, approval, signatures or other action of the Beneficiaries required or contemplated by the terms of said THE LGR INVESTMENT TRUST."

Baker testified that she received mail from Friedman about the name of the partnership. She stated: "I called him on the phone, I said, 'What does that [LGR] mean?' And he said, 'Let's get rich.' And I was furious, that was—I—I knew that I shouldn't—I should never have done it. I knew it was wrong, wrong, wrong, and—and I've been a nervous wreck since." Tr. at 118.

Baker was justified in her reservations about her investment in the LGR Partnership because, during his testimony, Fried-man admitted that he never apprised Baker that he expected the interest payments on the policies to pay the premiums for which he and Mauro were responsible, thereby substantially limiting their partnership contributions in relation to hers. He also admitted that he did not advise her that he and Mauro had found the policies before the meeting in Brockton and that the surrender values of the policies totaled $70,000.

The Partnership Agreement contained a recitation of the purpose of the Partnership, namely "to purchase issued and existing in force life insurance policies [sic] on the lives of a person or persons other than the Partners and *to maintain such policies of insurance in full force and effect until recovery* by the partnership of death benefits payable under such policy(ies)...." (Exhibit 6 at ¶ 1)(emphasis supplied). It also provided that the principal place of business of the Partnership would be at the address of Friedman's law office, *id.* at ¶ 4, that "[a]ll costs and liabilities incurred in connection with the operation of this partnership shall be borne and shall be paid for by the Partners in proportion to their respective capital interest set forth in Schedule A." *Id.* at ¶ 9. Schedule A provided the following:

| PARTNER | CAPITAL INTEREST | PROFITS INTEREST |
|---|---|---|
| Lorraine Baker | 33.34% | 33.34% |
| Paul J. Mauro | 33.34% | 33.34% |
| Michael P. Friedman | 33.34% | 33.34% |

CAPITAL CONTRIBUTIONS

| | |
|---|---|
| Lorraine Baker | $125,000 |
| Paul J. Mauro | 50% of all required additional capital contributions |
| Michael P. Friedman | 50% of all required additional capital contributions |

(Exhibit 6, Schedule A).

The Partnership Agreement precluded any partner from borrowing against, cancelling or otherwise executing any document or agreement which would in any

manner effect the payment of the proceeds of life insurance policies owned by the Partnership. *Id.* at ¶ 14(G). The Partnership Agreement also contained a restriction on the sale or transfer of partnership interests as follows: "No Partner may sell, transfer, assign, mortgage, grant a security interest in or otherwise dispose of any part of his partnership interest, except with the consent of all the Partners or as specifically allowed in this agreement." *Id.* at 17. With respect to notices, the Agreement provided that "[a]ny notice, statement or other communication required or permitted to be given under this agreement by any party to another shall be in writing and shall be sufficiently given if sent by registered or certified mail, postage prepaid to ... [the partners] ... or delivered in hand to such party or by had at the address aforesaid."

In addition to the foregoing provisions, the Partnership Agreement provided that the Partnership "may maintain checking or other accounts in such bank or banks as the Partners shall determine ...." (Exhibit 6, ¶ 11). It further provided for the maintenance of accounting records and the issuance of yearly statements prepared by an independent accountant showing the financial condition and the profits or losses from operations. (Exhibit 6, ¶ 13). The accounting records and statements were to be available to the Partners for their inspection. *Id.* Finally, the Partnership Agreement provided that "[a]ll determinations affecting the conduct of the affairs of the Partnership shall be made by a vote of the Partners owning fifty (50%) percent or more of the percentage of Partnership interests." *Id.* at ¶ 10. Thus, the Partnership Agreement gave Friedman and Mauro control over partnership affairs and Baker was effectively precluded from making any decisions affecting the partnership without the involvement and consent of

either Friedman or Mauro who were acting in concert.

The Partnership Agreement did not designate Friedman, Mauro or Baker as the managing partner. Friedman, however, assumed that role as he undertook the responsibility of negotiating with Fallon with respect to the purchase of the policies, his office address was designated as the place of business of the partnership, and he eventually accounted to Baker for the use of her $125,000 contribution. In addition, he advised Life of Virginia and Manhattan National Life Insurance Company ("Manhattan National Life") to communicate only with him, and he was the partner who received statements from them. There was no evidence that any of the other partners played any significant role in the management of the affairs of the partnership other than Friedman.

Friedman testified that The LGR Investment Trust was a nominee trust created for the purpose of concealing Mauro's identity from DeCotis because Mauro had sold or was selling insurance to DeCotis. Its assets were the life insurance policies and the beneficiary of the trust was the partnership. Following the execution of the Partnership Agreement, Friedman wrote to Fallon, DeCotis's attorney, on February 15, 1991 informing him that he had deposited the $110,000 purchase price for the policies into an escrow account. (Exhibit 21).

On March 20, 1991, Friedman sent certified letters to Life of Virginia with respect to two policies and Manhattan National Life with respect to one policy. He enclosed two checks, each in the sum of $4,000, in the letter to Life of Virginia and one check in the amount of $6,528.70 to Manhattan National Life for deposits as premium payments. Although Pastel was the trustee of the LGR Investment Trust, in both letters Friedman stated "[p]lease

note that the only person authorized to receive information with respect to these policies is myself on behalf of the L.G.R. Investment Trust." (Exhibits 14 and 15).

Over one year after informing Life of Virginia and Manhattan National Life to communicate only with him, Friedman on April 24, 1992 wrote a letter to Baker advising her about her capital contribution. (Exhibit 12). He stated:

As you requested I enclose herewith copies of the checks representing the use of the proceeds of your original One Hundred Twenty Five Thousand ($125,000) Dollars contribution to the partnership.

The breakdown is as follows:

| | |
|---|---|
| Acquisition Costs of Policies: | $110,000.00 |
| Initial Premium Account | |
| Maintenance Costs | 6,528.70 |
| | 4,000.00 |
| | 4,000.00 |
| Wayne Pastel, Esquire | 800.00 |
| Federal Express Costs | 38.00 |
| Total | $125,366.70 |

According to Friedman, he and Mauro viewed the acquisition of DeCotis's life insurance policies as "an opportunity to pay small amounts of premium over the course of years, as required, to carry this policy and that the—that they would carry—they would pretty much carry themselves...." Tr. at 88. Indeed, the policies were inexpensive to maintain initially. After receiving a "Summary of Policy Activity" from Friedman in late July of 1992 (Exhibits 9 and 10), Mauro, in a letter to Friedman dated August 4, 1992, expressed the view that "the policy seems to be doing nicely with the interest credited still exceeding the cost of insurance." (Exhibit 19). Nevertheless, Friedman and Mauro eventually learned that, in Friedman's words, they were "sadly mistaken" about the nature of the investment. Not only did DeCotis not die from his existing medical condition as expected,[2] "interest rates went down dramatically and the policies no longer were capable of carrying themselves." Tr. at 88. Thus, Mauro and Friedman were required to make premium payments in the late 1990s to maintain the insurance policies. They were unable to sustain that financial burden. Friedman was involved in a divorce proceeding and his income, which peaked in 1991 at approximately $200,000, was insufficient in later years to maintain the policies, when it was half that amount and he had to contribute to the maintenance of an additional household.[3]

Although Friedman deposited Baker's $125,000 partnership contribution into his clients' funds account, advised her in April of 1992 as to how her contribution was expended, and directed the insurance companies to communicate only with him, he did not transmit policy summaries to her, or maintain accounting records for the partnership. He, however, did receive statements from the insurance companies, in which they accounted for the interest credited toward the cost of insurance. For example, in July of 1992, Manhattan National Life sent the LGR Investment Trust, in care of Friedman, a statement itemizing the premiums received, the expense charges, the interest credited, the cost of insurance, rider charges, and loan or surrender activity, as well as the accumulated cash value, the cash surrender value, the death benefit and the interest rates. (Exhibit 9). Friedman testified that he did not know how many premium payments Mauro made or in what amount. He also was unsure as to the full extent of the payments he made, although he submitted records showing that he made pre-

2. DeCotis is still living.

3. Friedman also he incurred substantial income tax liabilities following his divorce.

mium payments totaling approximately $18,000 to Life of Virginia. (Exhibit 13).

Despite some payments by Friedman and Mauro, eventually they knowingly permitted all three policies to lapse. In July, September and December of 1998, Life of Virginia wrote to the "LGR Trust % M Friedman" at the address of his law firm. It first notified him of an existing grace period and ultimately of the lapse of the two Life of Virginia policies, as well as the steps and payments necessary to reinstate and maintain the policies. (Exhibits 16, 17, and 18). The Life of Virginia letters were copied to Mauro but not Baker. Friedman failed to act. He did not notify Baker of his inability or Mauro's inability to make the premium payments; he did not notify her that the policies and her investment were in jeopardy; he did not notify her that the policies had lapsed; he did not advise her that the policies could be reinstated; and he did not inform her that payments could be made to reinstate the policies. At trial, he explained:

> I didn't send the letters because it was not Mrs. Baker's obligation to pay any more for any premiums on this thing. Any further premiums were supposed to be my responsibility and Paul Mauro's responsibility. I was embarrassed. I was ashamed. I was extremely distressed that we were at risk of—of—of losing not only our investment, but her investment; and what I—and Mr. Mauro and I did everything within our power, and I did everything within my power, to keep this thing alive for ten years, well beyond the time when I was financially bankrupt and—and—and into the

time when I . . . could no longer do it at all. I owed the federal government over $200,000, but instead of paying the federal government any of that money, I paid money towards premiums in this—in this thing because I felt that I had an obligation, a contractual obligation to pay, and I couldn't meet it, and it tore me up, and that's why I didn't send any letters to Mrs. Baker.

Tr. at 70–71. Although Friedman failed to inform Baker about the lapses of the insurance policies on DeCotis's life in 1998, he did keep her apprised of payments necessary to maintain the policies which were assets of the Lorraine Baker Irrevocable Trust during that same year. (Exhibit 22).

Baker testified that she was unaware of the lapses in the insurance policies that were assets of the LGR Partnership. Viewing her investment as a long term one that would ultimately benefit her children, Tr. at 122,[4] she testified that she did not learn of any problems with the policies until she received notice that Friedman had filed a Chapter 7 bankruptcy petition and that she was listed as a creditor.[5] Tr. at 119–20.

## III. DISCUSSION

A. *Did Friedman Have a Fiduciary Duty to Baker for Purposes of § 523(a)(4)*

### 1. Applicable Law

The first issue that this Court must determine is whether Friedman, as Baker's partner, was a fiduciary within the

---

**4.** Friedman fostered this assumption when he stated in the November 30, 1990 letter that "I will likely be creating a structure for holding these policies ... which will reflect our respective interests and obligations as well as allowing our respective heirs to receive our

interests if one of us should predecease the insured." (Exhibit 8).

**5.** The Court takes judicial notice that Friedman listed Baker on Schedule F as an unsecured creditor with a claim in an unknown amount.

meaning of § 523(a)(4). Although the First Circuit has not specifically ruled on the issue of whether a partner is a fiduciary, decisions from other circuits and from the bankruptcy court in this circuit are instructive.

In a Seventh Circuit decision, *In re Frain*, 230 F.3d 1014 (7th Cir.2000), the court evaluated the conduct of the debtor, Frain, the chief financial officer of a closely held, subchapter S corporation with three shareholders. Frain owned 50 % of the shares and was authorized to make day-to-day decisions, as well as all decisions affecting the normal operations of the business. 230 F.3d at 1016. Frain also was authorized to receive a salary, and the shareholders were to receive distributions of cash flow according to an agreed upon priority. Frain did not make distributions according to the specified priorities (first, federal and state income taxes, second, repayment of shareholder loans, and, finally, payments of the balance of the cash, all in proportion to the ownership interests of the shareholders). When the corporation ceased operations and Frain filed an individual Chapter 7 bankruptcy petition, the minority shareholders sued contending that the balance of the corporation's outstanding loans to them were nondischargeable under § 523(a)(4) because Frain breached his duty to them while he was acting in a fiduciary capacity. *Id.*

In reversing the bankruptcy court's determination that Frain's obligations to the minority shareholders were dischargeable because the terms of the shareholder agreement did not create a fiduciary relationship, the circuit court articulated several principles pertinent to a finding of fiduciary status under § 523(a)(4) which are repeated in virtually all cases involving that section of the Bankruptcy Code. First, it observed that the existence of a fiduciary relationship is a matter of federal law and that all fiduciary relationships do not qualify under the Bankruptcy Code for purposes of § 523(a)(4). *Id.* at 1017. The court then observed that the fiduciary obligation must exist prior to the alleged wrong and that, as a consequence, a constructive trust will not qualify for purposes of § 523(a)(4). *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)).[6]

The Seventh Circuit in *Frain* "defined a fiduciary relationship under § 523(a)(4) as 'a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter.'" *Id.* at 1017 (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994)). With respect to Frain's conduct, it stated that his superior knowledge of day-to-day operations was insufficient in itself to establish a position of ascendancy. It found, however, that the concentration of power in the corporation was substantially one-sided, that the shareholder agreement was structured to give Frain ultimate power over both his own employment and the direction of the corporation, that the only real limit on his power was the chance of a deadlock, and that no major decision could be made without Frain's agreement, including his own termination. *Id.* at 1017–18. The court concluded that "a fiduciary relationship was created by the structure of the corpora-

---

6. In *In re Baylis*, there was no dispute that the debtor was a fiduciary. The First Circuit, however, observed that the Supreme Court's determination that the exception for fiduciary capacity applies only to express trusts, and not to equitable trusts created by the debtor's conduct is "in doubt." 313 F.3d at 17 n. 3 (citing *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir.2001) (ambassadors are fiduciaries for countries they represent)).

tion under the shareholder agreement," rejecting Frain's contention that the violation a contract entered into among equals was not covered by § 523(a)(4). Summarizing its holding, the court stated: "A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over [the minority shareholders]." *Id.* at 1018.

Similarly, in *Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir.1987), the Ninth Circuit considered the business relationship between joint venturers. The debtor, Short, handled the affairs of the joint venture, which was profitable. Short and his spouse, however, appropriated the profits for personal living expenses, and when Short filed a bankruptcy petition the Lewises sought an exception to his discharge under § 523(a)(4). In rejecting Short's argument that a partner is not a fiduciary, the court looked to state law, stating "[a]lthough the concept of fiduciary capacity is a narrowly defined question of federal law, state law can be consulted to determine when a trust exists." 818 F.2d at 695 (citing *Ragsdale v. Haller (In re Haller)*, 780 F.2d 794, 797 (9th Cir.1986)). The Ninth Circuit determined that " 'if state law makes clear that a partner necessarily is a trustee over partnership assets for all purposes, then that partner is a fiduciary within the narrow meaning of § 523(a)(4).' " 818 F.2d at 695 (citing *Haller*, 780 F.2d at 797). Looking to both statutory and case law, the court concluded that the debtor was a fiduciary and owed the Lewises "the obligation of candor and utmost good faith in dealings with each other" as well as undivided loyalty. *Id.* at 695.

 In Massachusetts, partners occupy a trust relation toward each other and are bound to exercise the utmost good faith toward each other. *Hawkes v. First Nat'l Bank of Greenfield*, 264 Mass. 538, 543, 163 N.E. 246 (1928). Further, the standard of duty owed by partners to one another is one of utmost good faith and loyalty. *Cardullo v. Landau*, 329 Mass. 5, 8, 105 N.E.2d 843 (1952). In *Bane v. LeRoux (In re Curran)*, 157 B.R. 500 (Bankr.D.Mass.1993), Judge Hillman summarized the status of partners in Massachusetts for purposes of § 523(a)(4) as follows:

Massachusetts courts have universally recognized the fiduciary relationship of partners and impose on them obligations of good faith and integrity in their dealings with one another in partnership affairs. *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976); *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (1952); *Nelson v. Bailey*, 303 Mass. 522, 22 N.E.2d 116 (1939). It is a fundamental characteristic of partnership that the partners' relationship is one of trust and confidence. *One partner cannot, directly or indirectly, use partnership assets for his own benefit;* he or she cannot, in conducting the business of the partnership, take any profit clandestinely, the partner cannot carry on the business of the partnership for private advantage; *nor can he or she avail himself or herself of knowledge or information which may be regarded as property of the partnership. Latta v. Kilbourn*, 150 U.S. 524, 541, 14 S.Ct. 201, 207–08, 37 L.Ed. 1169 (1893).

The Supreme Court as well as Massachusetts common law clearly evince an intent that *partners act as trustees for the benefit of each other with respect to the trust res which consists of the partnership assets.* A partnership is an association. Mass.Gen.L. ch. 108A § 6(1). It is created by a voluntary contract.

*Boyer v. Bowles,* 310 Mass. 134, 37 N.E.2d 489 (1941). The Court finds that Massachusetts partnerships satisfy the necessary elements of an express trust and that partners act in a fiduciary capacity toward each other for purposes of § 523(a)(4).

157 B.R. at 509–10 (emphasis supplied).

### 2. Analysis

■ This Court agrees with Judge Hillman's conclusion in *Curran* and finds that, under Massachusetts law, Friedman, as Baker's partner, owed her a fiduciary duty for purposes of § 523(a)(4) with respect to the partnership assets, namely the DeCotis insurance policies.

In addition, under the test articulated by the Seventh Circuit in *Frain,* the Court finds that Friedman held a position of ascendancy over Baker that imposed fiduciaries duties upon him. Although the Partnership Agreement provided that the partners held equal interests and did not specifically designate Friedman as the managing partner, the evidence was unequivocal that he assumed the role of managing partner and together with Mauro controlled the affairs of the partnership, withholding pertinent information about the performance of the policies from Baker, relying upon her trust and confidence in them, her lack of sophistication, and her assumption that her investment was a long-term one.

Numerous facts support the conclusion that Friedman controlled partnership affairs and owed Baker a fiduciary duty. The principal place of business of the partnership was Friedman's law firm. Using the letterhead of Brickly, Sears & Sorrett, P.A., Friedman negotiated with Fallon for the purchase of DeCotis's insurance policies, he arranged for Pastel to draft the partnership and trust documents, and he notified Life of Virginia and Manhattan National Life to communicate only with him about the policies, stating "the only one authorized to receive information with respect to these policies is myself on behalf of the L.G.R. Investment Trust." Thus, in addition to assuming the mantle of managing partner of the Partnership, he assumed the role of trustee of the LGR Investment Trust, apparently usurping Pastel's function.

Friedman's position of ascendancy over Baker preceded the execution of the Partnership Agreement and the LGR Trust and continued through the 1990s. He and Mauro identified Baker, a recent widow, as a potential investor, with access to cash that they lacked. Friedman misrepresented to Baker that an emergency existed requiring a visit to her home and an immediate decision to invest. He and Mauro went to her home and pressured her into joining them in an investment "opportunity" of their devise without disclosing pertinent information to her about their expected contributions, which they anticipated would be insubstantial in relation to hers, as well as the significant risks involved should their assumptions about their level of contribution and DeCotis's life expectancy prove unfounded. Although Friedman pretended to warn Baker that he could not and would not act as her attorney and that she should obtain the advice of independent counsel, the timing of the November 30, 1990 letter and its execution by Baker three days later, meant that the advice she received from him was effectively nullified. Thus, even if Friedman were not technically acting as Baker's attorney with respect to the partnership, his role as her attorney contributed to his position of ascendancy over her and explains the level of trust she placed in him for over a decade. Friedman and Mauro took advantage of their prior association with Baker's spouse, and Friedman took advantage of Baker in his role as her attorney, to induce her to

invest in a vehicle she did not fully understand and of which she was leery. Once her money was in his clients' funds account, Friedman immediately took steps to acquire the life insurance policies that he anticipated would reap him substantial benefits. As her partner and as someone in a position of ascendancy over her, he owed her a fiduciary duty. He was obliged to act with the utmost good faith and loyalty, and he had an obligation to inform her about the performance of the policies and advise her when the partnership assets were in jeopardy.

### B. *Was There a Defalcation by Friedman While Acting in a Fiduciary Capacity?*

#### 1. Applicable Law

 In *In re Baylis*, the United States Court of Appeals of the First Circuit, articulated six rules that apply to the determination of the availability of the exception to discharge under § 523(a)(4):

> 1) The burden of proof to establish defalcation is on the creditor, given the "fresh start" policy.
>
> 2) The creditor must show defalcation by a preponderance of the evidence.
>
> 3) The exception to discharge applies to fiduciaries only while they are acting in a fiduciary capacity.
>
> 4) Inherent in "defalcation" is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation.
>
> 5) In order to avoid redundancy, defalcation must mean something other than fraud and different from "willful and malicious injury," 11 U.S.C. § 523(a)(6).
>
> 6) Defalcation is to be measured objectively.

313 F.3d at 17 (citations omitted, footnotes omitted). In *Baylis*, there was no dispute that the debtor was a fiduciary. Accord-

ingly, the court focused on "the standard to measure when a fiduciary breach is a 'defalcation.'" 313 F.3d at 17. Stating its view that "not every breach of a fiduciary duty amounts to defalcation," *id.* at 18, the court observed:

> The present range of interpretations of "defalcation" among the circuits, from innocent mistake to a civil recklessness standard, does not, in our view, adequately capture Congress's intended meaning of the term in § 523(a)(4). Instead, we find that a defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement. Our view is based on both the structure of 11 U.S.C. § 523(a) and the "fresh start" policy.

*Id.* at 18–19. The court added:

> We believe that defalcation lessens the threshold required from one of criminal or civil fraud to something less. To show defalcation, a creditor need not prove that a debtor acted knowingly or willfully, in the sense of specific intent. However, a creditor must be able to show that a debtor's actions were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny.
>
> A debtor fiduciary may not escape the exclusion from discharge of his debt arising out of defalcation by saying he had no specific intent. As in other areas of the law, circumstances will provide the level of wrongdoing needed to constitute a defalcation.... The mental state required for defalcation is akin to the level of recklessness required for scienter. It is more than the mere conscious taking of risk associated with the usual torts standard of recklessness. Instead, defalcation requires something close to a showing of extreme recklessness.

In evaluating whether there is a defalcation of a fiduciary duty, there must be reference to the duty involved. Of the various duties, the duty of loyalty is "[t]he most fundamental duty owed ... the duty of a trustee to administer the trust solely in the interest of the beneficiaries."

Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest ... As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty.

*Id.* at 20–21.

## 2. Analysis

 Following the rules and standards articulated by the court in *Baylis,* this Court finds that Baker sustained her burden of proving a defalcation by Friedman in his fiduciary relationship with her arising from the Partnership Agreement and from his position of ascendancy over her. The Court finds that Friedman breached the duties imposed upon him as Baker's business partner. In particular, the Court finds that Friedman breached his duty of loyalty to Baker by putting his self-interest ahead of hers when he concealed from her that the assets of the partnership were in jeopardy of loss due to nonpayment of premiums, when he permitted the premiums to lapse without notifying her, and when he failed to advise her that the premiums had lapse but could be reinstated. Rather than reveal to Baker the true nature of her investment and provide her with at least the opportunity to protect it when he could no longer pay the insurance premiums, he disregarded his duty to her as managing partner.

Friedman testified that he was ashamed and embarrassed by his inability to pay the premiums. While the Court does not doubt that Friedman was ashamed and embarrassed, the Court disbelieves and rejects Friedman's testimony that he did everything he could to protect the premiums. When he was no longer able to pay the premiums, he should have contacted Baker and advised her of the problem, giving her the opportunity to protect her investment. Tinged with self-pity, his testimony was unconvincing, indeed, unbelievable. The Court finds that a more likely reason for Friedman's inaction was fear—fear that Baker would find out that she had been mislead about the nature of the investment, fear that she would find out that Friedman and Mauro used her substantial contribution to make an investment in insurance policies that they could not afford if their assumptions about their levels of contribution and DeCotis's health proved incorrect, and fear that she might report him to the Board of Bar Overseers for attorney misconduct were he to reveal the circumstances of the investment and provide her with information necessary to protect the partnership assets by, among other things, obtaining counsel, paying the premiums herself and dissolving the partnership.

Although Friedman argues that he did not improperly take profits from the partnership, the Court refuses to view his conduct in such a simplistic and limited light. By keeping Baker in the dark from the inception of the partnership about the performance of the policies, he was able to continue the practice of law and earn a living unencumbered by any potential investigation into his ethical conduct as a partner or an attorney engaged in a business transaction with a client. Thus, Friedman indirectly used the partnership and its assets for his own self-preservation and benefit. By concealing the knowledge

that the insurance policies that were the assets of the partnership were in danger of lapsing, by permitting the policies to lapse, and by concealing the lapse from Baker, he violated his duty of loyalty and acted in a reprehensible and extremely reckless manner. His disloyalty to her cannot be excused by reliance upon the terms of the Partnership Agreement that limited her contribution to $125,000, as his conduct ensured that her contribution and the partnership assets would be wasted.

The Debtor relies upon *R.E. Amer., Inc. v. Garver (In re Garver)*, 116 F.3d 176 (6th Cir.1997) to support his position that his conduct amounted to no more than a breach of contract. The Sixth Circuit summarized the facts in *Garver* in a latter decision, *Peoples Bank & Trust Co. of Hazard v. Penick (In re Penick)*, 149 F.3d 1184, 1998 WL 344039, *3—*4 (6th Cir. 1998), *cert. denied,* 525 U.S. 1055, 119 S.Ct. 618, 142 L.Ed.2d 558 (1998). It stated:

Garver, who had been the attorney of the creditor, R.E. America, Inc. ("REA") ... and REA entered a joint venture in which each party was supposed to contribute $600,000 towards the ownership by equal shares of another company. REA turned over the money to Garver, who issued REA an unsecured promissory note executed on behalf of a holding company that Garver controlled. Despite the parties' agreement, Garver contributed only $17,500 of his own money towards the purchase. The joint venture failed, and Garver filed for bankruptcy the following year. In a state court proceeding, a jury found that Garver breached his contract with REA and committed legal malpractice by violating his fiduciary duties to his client, and awarded REA $600,000. In the bankruptcy proceeding, REA sought to have the $600,000 debt excluded from discharge under the defalcation provision of § 523(a)(4). The bankruptcy

court ruled the debt non-dischargeable and the district court affirmed. On appeal, we considered whether the fiduciary relationship between attorney and client satisfied the "fiduciary capacity" required by § 523(a)(4).

Although the parties in that case had "stipulated to the existence of a fiduciary relationship satisfying the defalcation provision of § 523(a)(4)," we held nonetheless that "[t]he attorney-client relationship, without more, is insufficient to establish the necessary fiduciary relationship for defalcation under § 523(a)(4). Instead the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4)." 116 F.3d at 179. Under this narrow construction of this provision, "[t]he mere failure to meet an obligation while acting in a fiduciary capacity does not rise to the level of defalcation; an express or technical trust must also be present." *Id.* We reemphasized this requirement as we concluded: "In sum, under *Interstate Agency* the defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180.

The Sixth Circuit's decision in *Garver* was predicated upon the absence of an express trust and its narrow interpretation of "fiduciary capacity." The Sixth Circuit, however, recognized that its narrow interpretation was not universal and that the Seventh Circuit in *In re Marchiando*, 13 F.3d 1111 (7th Cir.1994), had implied that the fiduciary relationships between lawyers and their clients, or directors and their corporations, satisfy the "fiduciary capacity" requirement of § 523(a)(4) "because the fiduciary obligations pre-exist

the debt caused by the breach of that duty." *Penick*, 1998 WL 344039 at *4 n. 1. Indeed, the Second Circuit has stated its disagreement with the holdings of *Garver* and *Penick* in *Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162 (2d Cir.1999), in which it stated:

> [T]he reasoning of the opinions in cases such as *Garver*, even if not required by the facts, rejects the view that the attorney-client relationship is of a fiduciary nature for purposes of Section 523(a)(4). We respectfully disagree with that reasoning. Instead, we follow the Eighth Circuit in holding that the attorney-client relationship, without more, constitutes a fiduciary relationship within the meaning of Section 523(a)(4).... [W]e hold that the attorney's fiduciary obligation extends to matters involving fee agreements.

183 F.3d at 170–71.

This Court rejects the narrow view espoused by the Sixth Circuit in *Garver*. The plain meaning of § 523(a)(4) supports the conclusion reached by the Sixth Circuit, and such a narrow reading of fiduciary capacity, in this Court's view, improperly shifts the balance between the fresh start policy of the Bankruptcy Code and the exceptions to discharge set forth in § 523(a) in favor of the former. That balance can be appropriately maintained through the application of the defalcation standard to the conduct of fiduciaries articulated by the First Circuit in *Baylis*.

In *Garver*, the Sixth Circuit also narrowly construed the definition of defalcation, finding that the bankruptcy court improperly expanded the definition to include "'failure to meet an obligation.'" 116 F.3d at 179 (citing Black's Law Dictionary (6th Ed.1990)). It defined defalcation as "the embezzlement, misappropriation of trust funds held in a fiduciary capacity,

and failure to properly account for trust funds." *Id.* (citing *Capitol Indem. Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 125 (6th Cir. 1985)). It explained: "[t]he mere 'failure to meet an obligation' while acting in a fiduciary capacity simply does not rise to the level of defalcation: an express or technical trust must also be present." *Id.* (footnote omitted).

In this case, Friedman contends that his mere failure to meet his obligation to pay his share of the premiums results in the dischargeability of any obligation he may owe to Baker. In addition to *Garver*, he relies upon *Tucker v. Nestor (In re Nestor)*, 202 B.R. 181 (D.Mass.1996). In that case, the debtor was a general partner of a limited partnership in which each partner invested $30,000 for the purpose of investing and managing income-producing real estate. As the general partner, the debtor had the sole responsibility for acquiring, managing and disposing of partnership property. According to the district court, the partnership agreement provided that the debtor "would have a 'fiduciary' responsibility for the safekeeping and use of all partnership funds, and obliged [him] to prepare quarterly financial reports which were to be distributed to the limited partners on an annual basis." 202 B.R. at 182. Although the partnership agreement established a two year term and the debtor acquired several investment properties for development, the debtor was unable to secure necessary financing, the properties were foreclosed and the debtor could not return the limited partners' investments. *Id.* When the debtor filed a Chapter 7 petition, Tucker, one of the investors, filed a complaint against him under § 523(a)(4) alleging, inter alia, that he failed to provide financial reports to the investors and to file a limited partnership certificate, thereby exposing the limited partners to

liability. Although the bankruptcy court found that the debtor's failure to satisfy his accounting obligations constituted a defalcation while acting in a fiduciary capacity, it concluded that the defalcation was not the cause of Tucker's loss; rather the loss was caused by the collapse of the real estate market. *Id.* The district court affirmed.

In its decision, the district court framed the issues as "whether this failure [to issue annual financial reports and to file a certificate of limited partnership] constituted a defalcation, and, if so, whether the debt Nestor [the debtor] owes Tucker is nondischargeable 'for' that defalcation." *Id.* at 183. The court observed that "[t]he failure properly to account for money or property entrusted to one constitutes 'defalcation' within the meaning of § 523(a)(4)... [and][a] fiduciary who can neither produce funds held in trust nor satisfactorily explain his inability to do so is guilty of defalcation." *Id.* Because the bankruptcy court found that the debtor had furnished a legitimate explanation for his failure to return Tucker's investment, had produced all of the partnership's checks and financial records during discovery, had provided oral financial reports to the investors during the life of the partnership, and had testified about the troubled real estate market at trial, the district court questioned the bankruptcy court's conclusion that a defalcation had occurred. It concluded, however, that "even if Nestor's failure to satisfy his accounting and reporting obligations is considered a defalcation, the bankruptcy court's holding was nevertheless justified." *Id.* at 184.

The Court finds that *In re Nestor* is distinguishable from the instant case. In the first place, Friedman's explanation for his failure to notify Baker that the life insurance policies were in jeopardy of lapsing, i.e., that she was not obligated to make further contributions and that he was embarrassed and ashamed, was unsatisfactory. Moreover, unlike the situation in *Nestor* where the failure to account did not occasion the loss, in this case, Friedman's failure to notify Baker that the policies were in danger of lapsing and had lapsed but could be reinstated, directly caused her loss.

The Court finds that Friedman was charged, as were all the partners, with protecting a specific trust res: the DeCotis insurance policies. Because the partnership was not engaged in a business activity and thus did not generate income as its purpose was merely to hold the policies, Friedman was not required to account for revenue and expenses. The policies, however, did generate interest initially, which was applied to the payment of premiums by Life of Virginia and Manhattan National Life. Although the partnership did not receive the interest directly, Friedman, who instructed Life of Virginia and Manhattan National Life to communicate only him, was the only partner in a position to adequately review the statements he received and to act to protect the partnership assets, if either he or Mauro could not pay the premiums. In the statements he received, Life of Virginia and Manhattan National Life accounted to the LGR Investment Trust, in his care, for premiums received, expense charges, interest credited, the cost of insurance, rider charges and Loan or Surrender Activity, as well as the accumulated cash value, the cash surrender value, and the interest rates. Although Friedman was not charged with accounting for income generated by the partnership as none was contemplated, the assets of the partnership fluctuated in value depending upon the interest rates and the premiums received. Thus, Friedman had a duty to account to Baker with respect to the performance of the policies and, at a minimum, advise her when they

were at risk of lapse for nonpayment. His conduct in permitting the assets to be lost without informing Baker was a defalcation, rendering his obligation to her nondischargeable. Thus, this is not a case where Friedman simply breached a promise to pay. Rather, Friedman breached his fiduciary duty of loyalty and committed a defalcation within the meaning of § 523(a)(4) by failing to disclose information within his knowledge and control to Baker that would have enabled her to both protect her original investment and the partnership assets.

C. *What is the amount of the dischargeable debt?*

In her Complaint, Baker requested the Court to find that Friedman owed her $444,529.70, representing her investment of $125,000, plus interest at the rate of 12%. Her request was predicated upon a fraudulent inducement theory. The Debtor, however, did not explore the issue of the amount of the debt in her brief in relation to the evidence that the Debtor's defalcation was not with respect to her partnership contribution but with respect to his failure as the managing partner of the LGR Partnership to advise her that the partnership assets were at risk.

■■■■ The basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed. *Laurin v. DeCarolis Const. Co., Inc.,* 372 Mass. 688, 691–92, 363 N.E.2d 675, 678 (1977). *See* 5 A. Corbin, Contracts § 992 (1964). In *F.A. Bartlett Tree Expert Co. v. Hartney,* the court stated:

A plaintiff in an action for breach of contract is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him and to put him in as good a position financially as he would be in had there been no breach. *Bucholz v. Green Bros.*

*Co.,* 272 Mass. 49, 54, 172 N.E. 101; *Cragin v. Jones,* 283 Mass. 474, 479, 186 N.E. 578; 5 Williston, Contracts, § 1338; Am.Law Inst. Restatement, Contracts, § 329. The fundamental principle upon which the rule of damages is based is compensation. Its object is to afford the equivalent in money for the actual loss sustained by the wrong of another. *Sullivan v. Old Colony Street Railway Co.,* 197 Mass. 512, 516, 83 N.E. 1091, 125 Am.St.Rep. 378; *Daniels v. Celeste,* 303 Mass. 148, 150, 21 N.E.2d 1, 128 A.L.R. 682. Compensation is the value of the performance of the contract, that is, what the plaintiff would have made had the contract been performed.

308 Mass. 407, 411–12, 32 N.E.2d 237, 240 (1941).

■■■ Because this Court has found that Friedman's defalcation involved the insurance policies, not Baker's initial $125,000 investment in the partnership, the Court concludes that the measure of damages should be determined with reference to the Partnership Agreement. As the court stated in *Hartney,* "[c]ompensation is the value of the performance of the contract ... what the plaintiff would have made had the contract been performed." *Id.* Because the Partnership contemplated that Baker would have received one-third of the death benefits payable under DeCotis's life insurance policies, the damages she sustained total $1.1 million because that is the amount she would have received had the contract been performed. Because the policies were permitted to lapse and no benefits will be paid to the partnership upon DeCotis's death the fact that DeCotis is still living is not relevant to the measure of Baker's damages. The benefit of the bargain from Baker's perspective is not the return of her initial investment,

but one-third of the benefits payable under the three life insurance policies.

### D. *The Statute of Limitations*

In his Memorandum and in a "Motion for Leave to File an Amended Answer or, in the Alternative to Amend His Answer to Allow the Pleadings to Conform to the Evidence," Friedman maintains that Counts I through VII of Baker's Complaint are barred by the applicable statutes of limitations because Baker "was aware of the disposition of the Partnership fund or the acts complained of in Counts 1 through 7, no later than April 24, 1991[sic]." *See* Mass. Gen. Laws ch. 260, §§ 2 and 2A. Baker opposed the Motion, arguing that the affirmative defense of the statute of limitations must be affirmatively pled in a responsive pleading, citing Fed. R.Civ.P. 12(b), made applicable to this proceeding by Fed. R. Bankr.P. 7012.

Upon consideration of the evidence, as well as the contents of the Debtor's Motion and Baker's response, the Court shall grant Friedman Leave to Amend His Answer to Allow the Pleadings to Conform to the Evidence. The Court finds, however, that Friedman's defalcation occurred in 1998, within the six-year statute of limitations for contract actions. Accordingly, even were the Court to grant the Motion for Leave, the Court's decision would remain unchanged.

### IV. CONCLUSION

In view of the foregoing, and pursuant to Fed. R. Bankr.P. 15(b), made applicable to this proceeding by Fed. R. Bankr.P. 7015, pursuant to Count IX, the Court shall enter a judgment in favor of the Plaintiff and against the Defendant/Debtor in the sum of $1.1 million.