**In re Bruce Alfred McINTOSH and Catherine Stewart McIntosh, Debtors.**

**Fidelity and Deposit Company of Maryland, Plaintiff,**

v.

**Bruce Alfred McIntosh, Defendant.**

**Bankruptcy No. 03–12484–8W7. Adversary No. 03–671.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 31, 2005.

Kurt E. Davis, Esquire, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for defendant, McIntosh.

Luis Martinez–Monfort, Esquire, Mills Paskert Divers, P.A., Tampa, FL, for plaintiff, Bond Surety.

*FINAL JUDGEMENT AND MEMORANDUM DECISION IN FAVOR OF DEFENDANT BRUCE A. MCINTOSH*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

Under Florida law, a trust relationship may be created imposing fiduciary duties on a construction company's principal for the benefit of its bond surety. The fiduciary duties prohibit the principals of the construction company from using the proceeds from bonded jobs for improper purposes. In this case, faced with the imminent financial demise of their con-

struction company ("Company"), the principals of the Company, including the defendant/debtor, Bruce Alfred McIntosh ("Debtor" or "McIntosh"), worked cooperatively with the plaintiff, Fidelity and Deposit Company of Maryland ("Bond Surety"), to continue operations in order that bonded jobs could be completed. The continued operations required the payment of various operating expenses of the Company needed to keep the business afloat while the bonded jobs were being completed.

The Bond Surety now takes the position in this proceeding that the Debtor's decision to make the payments from receipts on bonded jobs constitutes a breach of fiduciary duty within the purview of section 523(a)(4) of the Bankruptcy Code and thus gives rise to a nondischargeable debt. Under the circumstances of this case, the Court rejects the Bond Surety's position and finds that once the Bond Surety determined to work with the principals of the construction company to complete construction work, it agreed to the payments and waived any requirement that the funds from bonded jobs not be used for expenses of operations. Accordingly, for the reasons set forth below, the Court will enter judgment for the Debtor and against the Bond Surety.

### Findings of Fact

The Company was a highway site construction business that was formed in 2000 by McIntosh, and his partner, Don Shackelford ("Shackelford"). Shackelford was the president and person responsible for the field operations. McIntosh was functionally equivalent to a chief operating officer, with the responsibility for overseeing the company's operations and finances at the home base.

In order to obtain government contracts, a construction company must have bonding capacity. Accordingly, after a brief search, McIntosh and Shackelford identified and subsequently entered into an arrangement with the Bond Surety to provide bonding capacity to the Company so that it could bid on and obtain construction contracts with governmental entities. Approximately 80 to 90 percent of the Company's work was in the area of governmental bonded jobs. The Bond Surety was the Company's bonding company throughout the Company's existence.

In early 2003, McIntosh recognized that impending start dates on governmental contracts were going to create a need for cash. Typically, the need for cash results from the fact that there is a lag time between work that requires expenditures for labor and materials and the payment on that work—resulting in the need for capital or financing.

McIntosh and Shackelford looked for sources of financing and initially were able to come up with some additional funds. However, it was not enough to meet the Company's cash needs. As a result, at the end of March of 2003, McIntosh had come to the realization that the Company was going to run out of cash and, in fact, would not be able to meet its upcoming payroll on Friday, April 4, 2003. Faced with this impending problem, McIntosh contacted the Bond Surety.

In the initial discussions with the Bond Surety about the Company's financial situation, it was made clear that the Bond Surety would hold Shackelford and McIntosh accountable under their personal guaranties if there was any shortfall in payments due on bonded jobs. Unquestionably, there was an immediate recognition by both Shackelford and McIntosh that they needed to cooperate fully with the Bond Surety. The history of their actions thereafter, in fact, evidences a spirit of full cooperation. Throughout this period, Shackelford's and McIntosh's actions

evidenced that they had accepted the inevitability of the situation—that the Company needed to work in cooperation with the Bond Surety to complete the bonded jobs, cease work on non-bonded jobs, and at the conclusion of this process go out of business.

The case was assigned by the Bond Surety to one of its claim attorneys—someone experienced with these types of defaults. The Bond Surety's assigned claims counsel ("Claims Counsel") ultimately appeared and represented the Bond Surety as its corporate representative before this Court.

An initial meeting between the parties was held on March 31, 2003, at the Bond Surety's Tampa office. The Bond Surety's Claims Counsel appeared telephonically, with both McIntosh and Shackelford personally attending the meeting. The Court infers that meeting was successful (considering the circumstances), in that the Bond Surety understood that they had a mutual problem, expressed a willingness to work with the Company, acknowledged that a payroll was coming due and payable, and recognized that if the Company went out of business before finishing the bonded jobs, the financial situation would be materially worse to everyone's detriment.

Claims Counsel indicated at that initial meeting that he would need financial information from the Company to make a decision regarding financial support to the Company. He stated that it was his preliminary view that the Bond Surety would not have a problem in assisting the Company to meet that Friday's payroll in order to tide the company over in the interim until the Bond Surety could make a final decision. During that week, McIntosh worked with the Bond Surety in providing the requested financial information.

It appears that when the Bond Surety has a Company in a potential default situation in the midst of ongoing construction work, that the Bond Surety uses the services of Perini Construction ("Perini"), a national construction company, to assist the Bond Surety in working through the potential default. Accordingly, the Bond Surety arranged for Perini to be retained to assist and analyze the situation with the Company. The representatives of Perini who were assigned to review the Company were Joel Golbraith ("Golbraith") and Brian Labbe ("Labbe"). Golbraith and Labbe were charged with quickly analyzing the Company's financial situation and reporting the results of that analysis to Claims Counsel. During the week of March 31st to April 4th, they collected information from McIntosh by phone and facsimile for that purpose.

While the Company was in the process of providing financial information to the Bond Surety, good news had developed. McIntosh contacted Hillsborough County on April 3, 2003, and learned that a check for approximately $282,000 would be paid in connection with two of the county's bonded projects to the Company the next day.

Due to the immediacy of the Company's payroll needs, and even though the Bond Surety had not received the final report from Golbraith and Labbe, the Bond Surety nevertheless funded the payroll for Friday, April 4, 2003. The Bond Surety did so by sending a cashier's check on April 3, 2003, by courier mail in time such that payroll was met.

On Friday, April 4, 2003, McIntosh called the Bond Surety's Claims Counsel to inform him about the $282,000 payment. (There is some confusion about the time frame of these calls, but it appears that McIntosh's learning of the county check was consistent with the surrounding circumstances or more consistent than any

other alternative in terms of dates.) During that April 4, 2003, telephone conversation, there were discussions of which debts would be paid by the Company. Claims Counsel testified that he emphasized the point that these were trust funds and that the only amounts to be paid would be limited to bonded job-related expenses. On the other hand, McIntosh testified that the discussions were not that specific. He did understand that non-bonded jobs were not going to go forward, but specific payments were not discussed in detail.

The Court believes that McIntosh's recollection is consistent with all of the facts and circumstances and more credible. The Court therefore finds that McIntosh's version is the more credible one to the extent that there were any discrepancies in the testimony. Consistent with McIntosh's testimony, there was a spreadsheet drafted (Exhibit 21), which by its notation appears to have been provided by McIntosh to Brian Labbe on or about April 4, 2003. The spreadsheet contained various items to include general operating expenses that McIntosh believed the Company would need to pay if it was going to continue in business for the limited purposes of completing the bonded jobs.

Golbraith and Labbe, as representatives of the Bond Surety, arrived physically at the Company's premises in the first part of the week of April 7, 2003, and remained there through April 9, 2003. McIntosh worked closely with those representatives over that period of time. The schedule of disbursements that was prepared and included as an attachment to the Perini report of April 10, 2003, is a spreadsheet dated Tuesday, April 8th. The items on that spreadsheet are all consistent with the items reflected in Exhibit 21 that had been previously provided by McIntosh to Labbe. It is clear that there was some "give and take" and negotiations between McIntosh and Labbe over what sort of expenses should be included in that schedule of disbursements.

The disbursement schedule attached to the April 10, 2003, report, which was provided by Labbe to the Bond Surety's Claims Counsel, did not cause any objection by the Bond Surety until much later, as discussed below. Labbe, in his deposition, expressed an awareness of the type of critical vendor that must be paid in order to keep a construction company going, and included in that description were critical vendors that would not work without being paid. Whether the needed payments pertained to a bonded job or to overhead—such as office and insurance cost and equipment leases—they still had to be paid.

It is clear to the Court what occurred here is that the Bond Surety, faced with an impending default by the Company, had a choice to make. It had two alternative ways to proceed. For the sake of simplicity, the Court will refer to these alternatives as "Plan A" and "Plan B." Plan A is to declare an immediate default, shut down the contractor, take possession of all amounts owed on the bonded jobs, and then deal with the default situation to include bringing in a substitute contractor to complete the various bonded jobs. Plan A is a very unattractive alternative since inevitably the interruption of the work can lead to delay damages, and costs of bringing a new contractor into existing constructions jobs far exceeds what it takes the existing contractor to finish the jobs.

Plan B, by comparison, is much preferable. It involves working cooperatively with the contractor to conclude the bonded jobs. Obviously, Plan B requires funding by the surety of the contractor's business operations so that it can stay in business to complete the jobs. Plan B was clearly the choice that was made by the Bond Surety

in this case—at least until the decision to part ways with the Company occurred in early June 2003.

Indeed, Labbe's assessment of McIntosh during this period was that he was working in good faith for the benefit of the Bond Surety to complete the bonded jobs and that payment of these critical vendors was consistent with this good-faith effort to achieve the goal of winding up the bonded jobs. McIntosh, for his part, recognized and acknowledged that the Bond Surety would not permit funding of non-bonded jobs. Consistent with this understanding, he immediately went to the non-bonded contracting parties and explained the situation that the Company would be walking away from those jobs. That is, in fact, what occurred.

Toward that end, the disbursements that were made by McIntosh were all consistent with McIntosh's discussions with Labbe as set forth in Exhibit 21 and attachment B to Exhibit 1. Payments were made to these vendors in the April 10th—11th time frame. Obviously, the payments could not have been sent earlier because the Company did not have the money to fund the payments until the check was received from the county—which would have been around the 9th or the 10th. By April 16, 2003, all of the checks had been disbursed.

There is some confusion in the check register because the dates in the check registers are different from April 10th or 11th. However, it is clear that the difference simply resulted from the date of input into the system, as opposed to the dates the checks were actually sent.

On April 16, 2003, the Bond Surety's Claims Counsel followed up with a call to McIntosh and requested details regarding the checks. A check register (Exhibit 19) was immediately faxed to him, setting forth those details. These were the amounts that McIntosh had concluded would need to be paid to keep the Company in business in order to conclude its bonded jobs. The list included payroll, various equipment leases, and items of general overhead. It was McIntosh's view at the time that if he had been told that it was the Bond Surety's decision to shut the Company down by not paying the necessary operating expenses, he would have shut it down and walked away.

As described above, it is without dispute that Perini, the Bond Surety's representative, knew of the disbursements. To avoid any imputation of this knowledge, however, the Bond Surety attempts to distance itself from Perini by denying that Perini was a representative of the Bond Surety. That assertion at trial is contrary to prior statements made by the Bond Surety in Exhibits 10, 11, and 17, all of which refer to Perini as the Bond Surety's representative. It is also contrary to all of the facts and circumstances surrounding Perini's involvement in this matter in April and May of 2003.

Following the April 16, 2003, fax to the Bond Surety's Claims Counsel, there were additional monies sent out by McIntosh in the approximate amount of $282,000. All of those distributions were consistent with the items set forth in attachment B to Exhibit 1. These funds also included the April 22, 2003, payroll—as detailed in a spreadsheet attached to a fax from McIntosh to Labbe dated April 23, 2003 (Exhibit 18).

It was not until Thursday, May 15, 2003, that the Bond Surety's Claims Counsel first stated in writing to McIntosh that the Bond Surety took exception to payments beyond those narrowly relating to bonded job payments, suppliers, and subcontractors of the bonded jobs. This objection occurred over four weeks after the sending

of the April 16, 2003, fax, three weeks after the follow-up distribution, and five weeks after Perini's report was issued, which detailed all of the disbursements to be made from the $282,000.

It appears from the Claims Counsel's testimony that it was generally his typical business practice to follow up important conversations and phone calls with confirming e-mails or letters. After observing and listening to Claims Counsel's testimony, the Court would be surprised if his business practices were otherwise. However, that practice did not occur here. It can be inferred from those circumstances that the decision to take exception with these payments was not made until later and that both the Bond Surety and Perini knew full well that the option that they had embarked upon required that these payments needed to be paid.

Subsequently, the parties parted ways. This followed a demand by the Bond Surety for certain documents to be signed by Shackelford and McIntosh. They did not agree to some of the terms demanded. An impasse resulted with the result that the "keys to the Company" were turned over to the Bond Surety in early June. As a result, another construction company stepped in and the losses to the bonding company have increased considerably.

### Conclusions of Law

■■ This adversary proceeding seeks a determination that the obligation by McIntosh to indemnify the Bond Surety is nondischargeable under section 523(a)(4) of the Bankruptcy Code.[1] Pertinent to this case, the plaintiff must prove that there is either an express or statutory trust in which the defendant had trust-like duties—clearly defined duties giving rise to a fiduciary obligation to treat the trust res according to those defined fiduciary duties—and that the defendant had breached his duties through a defalcation. *In re Hanft, M.D., P.A.*, 315 B.R. 617, 622–23 (S.D.Fla.2002); *In re Pupello*, 281 B.R. 763, 767 (Bankr.M.D.Fla.2002).

■■ Defalcation is the failure of a fiduciary to properly account for or produce the trust res according to the terms of the trust. For purposes of Section 523(a)(4), the defalcation does not need to rise to the level of embezzlement, fraud, or misappropriation. *Quaif v. Johnson, (In re Quaif)*, 4 F.3d 950, 955 (11th Cir.1993); *In re Baylis*, 313 F.3d 9, 17–18 (1st Cir.2002).

This Court often encounters construction companies in bankruptcy because construction is an inherently high-risk business. The Court has seen many cases of "robbing Peter to pay Paul." The Court has also seen many cases of insiders taking money improperly from bonded trust funds and applying them for their own personal gain. Clearly, such cases can involve a breach of fiduciary obligation.

The Court recognizes that the bond documents in the instant case do create a trust relationship, resulting in required care when handling the proceeds from bonded jobs. *In re McCormick*, 283 B.R. 680, 683–684 (Bankr.W.D.Pa.2002); *In re Wright*, 266 B.R. 848, 851 (Bankr.E.D.Ark. 2001). However, when a bonding company steps in and decides to go down the road of a plan of action to continue the business in order to complete the bonded jobs, it cannot have it both ways. It cannot have the contractor do the work, finish the jobs,

---

1. The complaint also contains a count for actual fraud under 11 U.S.C. § 523(a)(2)(A). However, at trial, there was absolutely no evidence of a material misrepresentation of a present fact to support such a claim. In fact, the plaintiff did not attempt to make out a case for actual fraud. Accordingly, it appears that this count was abandoned by the plaintiff since there was no evidence offered to support it.

and then later complain about the money that had to be spent to finish the jobs. This plan of action typically saves the bonding company an enormous amount of money that would otherwise be spent if another contractor were brought in to complete the work. If there is even a technical violation of any trust obligation, clearly under these circumstances presented here, it is waived. *See In re Baird,* 114 B.R. 198, 205 (9th Cir. BAP 1990).

The Court finds, however, no breach of fiduciary duty under the circumstances presented here. The monies were accounted for, and they were used for purposes that were fully disclosed in advance by McIntosh and approved by the Bond Surety's representatives.

Accordingly, the Court finds that there was no breach of fiduciary duty in the way these funds were handled. Secondly, even if a technical breach of any sort could have been found—which this Court does not find—any technical breach was waived under these circumstances.

For those reasons, the Court will enter judgment in favor of the defendant, McIn-tosh, and against the plaintiff, Bond Surety, with respect to the relief requested in the complaint.

Accordingly, it is

ORDERED:

1. Judgment is entered in favor of the defendant, Bruce Alfred McIntosh, and against the plaintiff, Fidelity and Deposit Company of Maryland, on counts I and II of the complaint.

2. The Court hereby determines that any and all debts owed by the defendant, Bruce Alfred McIntosh, to the plaintiff, Fidelity and Deposit Company of Maryland, were discharged in their entirety by the Discharge of Debtor that was entered by this Court on December 4, 2003.

DONE and ORDERED in Tampa, Florida, on January 31, 2005.